**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Oscar McINNIS and Patricia Parada,**
**Defendants-Appellees.**

**No. 78–3277.**

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1979.

John M. Potter, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellant.

Frank Maloney, David H. Reynolds, Austin, Tex., for McInnis.

Ramon Garcia, Edinburg, Tex., for Parada.

Before GOLDBERG, FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The United States contends that the Lindberg Act, the federal anti-kidnapping statute, as amended, 18 U.S.C. § 1201, forbids a conspiracy to lure a victim across an international boundary and then to kidnap him, and seeks to set aside a judgment dismissing an indictment charging those acts as a federal offense. It also appeals the dismissal of several counts of making false material declarations to a grand jury, in violation of 18 U.S.C. § 1623(a), while the grand jury was investigating those events. We conclude that the conspiracy charged is not proscribed by the federal statute. However, the grand jury did have jurisdiction to conduct an investigation and we remand for further proceedings on the false swearing counts.

## I. Facts

Defendant Oscar McInnis was the district attorney for Hidalgo County, Texas, and also conducted a private law practice. The co-defendant, Patricia Parada, was his client. Noe Villanueva, the alleged victim of the kidnapping plot, was once married to Parada. Villanueva, who was confined in the Hidalgo County Jail, was secretly working as a government agent during the events under consideration in this case.

The government alleged that McInnis planned to arrange for Villanueva to be released from jail, so that, in accordance with a scheme plotted with Parada, Villanueva could then be lured by Parada into Mexico, where he would be kidnapped and killed by Mexican police authorities in Reynosa, Mexico. However, Parada did not plan to go to Mexico; Villanueva was to travel alone. Daniel Rodriguez, an inmate at Hidalgo County Jail and a government informant, was enlisted by McInnis to contact a Mexican police officer named Cantu who would intercept Villanueva, hold him and arrange for his murder.[1] The meeting in Reynosa, the kidnapping, and the murder never occurred.[2]

The counts of making false material declarations to a grand jury arose out of McInnis's and Parada's testimony before the grand jury on June 7, 1978.[3] McInnis and Parada were called to testify after tape-recordings of their conversations with Rodriguez and Villanueva were played for the grand jury.[4]

---

1. Recordings of conversations between McInnis and Rodriguez comprise the bulk of the government's evidence against the defendants.

2. The indictment does not reveal any motive for this scheme. However, in its brief, the government says, "McInnis had animosity toward Villanueva, as he was bothering women whom the former knew" and McInnis "felt that Villanueva was a 'bastard' and a 'pest.'" The government suggests no reason for Parada's alleged complicity in the plot.

3. For the purposes of this opinion, we will accept, without deciding, the government's allegation that the grand jury was investigating the conspiracy to kidnap Villanueva and possible violations of his civil rights. *But see United States v. Cosby,* 5 Cir. 1979, slip op. 7111, 601 F.2d 754.

4. The circumstances surrounding the defendants' appearances before the grand jury were unusual. The subpoenas did not advise the defendants that they were targets of the grand jury investigation nor were they accompanied by the customary list of the rights of a grand jury witness. However, each of the defendants was warned immediately before testifying that he or she was a target of the grand jury investigation, that his or her testimony could be used against each of them, and each was informed of the constitutional rights against self-incrimination and to consultation with an attorney.

When McInnis was served with his subpoena, the United States Marshal told him that "it might be about some narcotics cases" that he was handling as the district attorney. The United States Attorney's office refused to give McInnis any information about the subpoena until he was formally warned on the record just before entering the grand jury room to testify.

Parada's subpoena was served in a more dramatic fashion. Four FBI agents and two U.S. Marshals served her with it at the university she was attending in Edinburg, Texas. Because her subpoena required her appearance instanter, the government agents took her to the grand jury in Brownsville. She was allowed to call her mother, but did not call her attorney. The district court found that Parada was "dissuaded from calling her attorney" at

In the course of his testimony, McInnis denied that: (1) he knew the details of the planned meeting between Villanueva and Parada in Reynosa or related them to Rodriguez; (2) he recalled meeting Parada at the time that she had agreed to meet Villanueva in Mexico; (3) he discussed the murder of Villanueva with Dan Rodriguez; (4) he discussed Officer Cantu with Rodriguez; (5) he received Villanueva's identification papers; and (6) he discussed the possibility of setting up Villanueva for arrest on narcotics charges or on charges of hiring someone to kill Villanueva's mother-in-law. These statements formed the basis of the six charges of perjury against McInnis.

During her testimony to the grand jury, Parada denied that she had agreed to meet Villanueva in Mexico and that McInnis had advised her to deny that such a meeting had been agreed upon. These statements were used as the basis for the charge of perjury brought against her.

The defendants were charged by indictment with conspiracy to kidnap and perjury. They filed motions to dismiss the kidnapping charge, premised on the theory that the acts alleged to have occurred in the course of the conspiracy to kidnap Villanueva were not prohibited by 18 U.S.C. § 1201, and motions to dismiss the perjury charges, based primarily on the contentions that the declarations were not material to an investigation within the jurisdiction of the grand

jury, and that the institution of the prosecution was defective because the government failed to follow the internal guidelines of prosecutorial practice established by the Department of Justice. After a pre-trial hearing on September 8, 1978, the district court dismissed all counts of the indictment from the bench. A written Memorandum and Order, denominated "the ruling of the Court" was signed September 15 and filed September 19.

The government filed a notice of appeal from the dismissal on October 13, 1978. It contends that the trial court was clearly erroneous in dismissing the kidnapping conspiracy count and the perjury counts. In response, the defendants filed motions to dismiss the appeal contending that the government's appeal was barred by statute, that the appeal was not timely, and that the prosecution violated the Justice Department's *Petite* policy.

## II. Motions to Dismiss the Appeal

■ There is no merit to the contention that jeopardy attached when the district court heard evidence in the course of deciding the motions to dismiss the indictment and that the government's appeal, therefore, is barred by 18 U.S.C. § 3731, which provides "no appeal [by the United States] shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." The Supreme Court

the time the subpoena was served on her and "was told that her attorney, Mr. McInnis, was waiting for her at the grand jury." According to Parada's testimony, immediately after she was served with the grand jury subpoena she asked to consult with her attorney and her request was refused. Shortly thereafter she was told that Mr. McInnis had also been subpoenaed and was before the grand jury at the courthouse.

At the pre-trial hearing on the motion to dismiss the indictments, the Assistant United States Attorney explained that he directed that the unusual steps be taken to prevent Parada from fleeing to Mexico before she testified, and to prevent the defendants from getting together and talking about their testimony in advance. Had Parada been refused the opportunity to consult with counsel during the grand jury proceedings, or misled by the government into foregoing that right, her right to counsel may have been denied. However, her testimony

and the grand jury record make clear that (1) Parada was aware of Mr. McInnis's presence at the courthouse where the grand jury proceedings were in progress; (2) the Assistant U.S. Attorney who conducted the questioning during her grand jury testimony advised Parada of her right to consult with an attorney before answering any question; and (3) she was informed of the subject matter of the investigation and told that she was a target of the investigation.

Appellees do not contend that Parada's right to counsel was denied. Nor do they suggest that the government's actions in this regard violated fundamental fairness or constituted an abuse of grand jury process. Given the evidence that Parada was informed of her right to counsel and was neither coerced nor manipulated into abandoning that right, we cannot join the district court's assumption of government misconduct.

has recently cut the ground from under the appellants' thesis by holding that "the defendant, by deliberately choosing to seek termination of the proceedings against him on a basis unrelated to factual guilt or innocence of the offense of which he is accused, suffers no injury cognizable under the Double Jeopardy clause"; therefore, the government may appeal from the dismissal of an indictment after evidence has been taken on a motion to dismiss. *United States v. Scott,* 1978, 437 U.S. 82, 97, 98 S.Ct. 2187, 2197–98, 57 L.Ed.2d 65, 78.[5] Here as in *Scott,* none of the grounds upon which the district court dismissed the indictment related to the factual guilt or innocence of the defendants.

 The defendants also contend that the government's appeal was not timely because notice of the appeal was filed more than thirty days after the district court dismissed the indictment from the bench. However, the appeal was filed within thirty days of the entry of a written and signed order granting the motion. The signed formal order is the "judgment"[6] and the prior oral statement from the bench was not an appealable order. *United States v. Hark,* 1944, 320 U.S. 531, 534–35, 64 S.Ct. 359, 361, 88 L.Ed. 290, 294–295; *United States v. St. Laurent,* 1 Cir. 1975, 521 F.2d 506, 511, *cert. denied,* 1976, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637; *United States v. Lee,* 1974, 163 U.S.App.D.C. 330, 339, 501 F.2d 890, 891

n. 1. There is no evidence that the formal order was prepared to circumvent the rule or to extend the time for the appeal.

 It is equally vain to invoke the Justice Department's *Petite* policy[7] on the basis that a state prosecution of the same matter was pending when the federal charges were filed. We have repeatedly refused to enforce that policy by dismissing an indictment; the practice of avoiding dual prosecution sets only an internal guideline for the Justice Department. *E. g., United States v. Michel,* 5 Cir. 1979, 588 F.2d 986, 1003 n. 19, *pet. for cert. filed,* 47 U.S.L.W. 3672; *United States v. Nelligan,* 5 Cir. 1978, 573 F.2d 251, 255.[8]

### III. Dismissal of the Indictment

#### A. *Conspiracy to Kidnap*

 The district court dismissed the conspiracy to kidnap count of the indictment on the ground of "legal impossibility"; it is not an offense to conspire to do an act that, if completed, would not be a crime.[9] The government contends that the federal statute is violated when a victim is merely inveigled into crossing an international boundary with the purpose of later kidnapping him; the defendants' scheme to seduce Villanueva across the international boundary so that a Mexican officer could kidnap him made them responsible as principals under 18 U.S.C. § 2(b).[10] That theory will

---

**5.** *See also Serfass v. United States,* 1975, 420 U.S. 377, 389, 95 S.Ct. 1055, 1063, 43 L.Ed.2d 265, 274 ("jeopardy had not yet attached when the District Court granted petitioner's motion to dismiss the indictment"); Cooper, *Government Appeals in Criminal Cases: The 1978 Decisions,* 81 F.R.D. 539 (1979).

**6.** Rule 4(b), F.R.A.P., provides in pertinent part:

When an appeal by the government is authorized by statute, the notice of appeal shall be filed in the district court within 30 days after the entry of the judgment or order appealed from. A judgment or order is entered within the meaning of this subdivision when it is entered in the criminal docket.

**7.** The *Petite* policy bars a federal trial following a state prosecution for the same acts, "unless the reasons are compelling." *Rinaldi v. United States,* 1977, 434 U.S. 22, 25 n. 5, 98 S.Ct. 81, 82, 54 L.Ed.2d 207, 211. *See also Petite v.*

*United States,* 1960, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490.

**8.** *Cf. United States v. Caceres,* 1979, —— U.S. ——, 99 S.Ct. 1465, 59 L.Ed.2d 733 (evidence obtained in violation of IRS internal regulations would not be excluded from a criminal prosecution; enforcement of the regulations left to the executive agency); *United States v. Hayes,* 5 Cir. 1979, 589 F.2d 811, 818 (statement by the Attorney General that was not promulgated and published as an official regulation cannot be used to invalidate an otherwise valid grand jury indictment).

**9.** *See, e.g., United States v. Pheaster,* 9 Cir. 1976, 544 F.2d 353, 362, *cert. denied,* 1977, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546.

**10.** "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

not bear exposure to the words of the statute. The federal kidnapping statute, 18 U.S.C. § 1201, as originally enacted in 1932, clearly reached only a kidnapping followed by interstate transportation, for it read:

Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.

The anti-kidnapping statute was adopted following the kidnapping of the son of Charles and Ann Morrow Lindberg, which was then prosecutable only as a state offense, to assist the states in combatting a "growing and serious menace." *Chatwin v. United States,* 1946, 326 U.S. 455, 463, 66 S.Ct. 233, 237, 90 L.Ed. 198, 902. "Comprehensive language was used to cover every possible variety of kidnaping *followed by interstate transportation." Ibid* (emphasis

supplied).[11] However, despite its broad language, the statute did not make either all abductions or even every seduction of victims into another state a federal crime. "In short, the purpose of the Act was to outlaw interstate kidnapings rather than general transgressions of morality involving the crossing of state lines." *Ibid.*

In oral argument, the government conceded that the plan would not have been a federal offense under the language of the original Lindberg Act even if it had been consummated. It asserted instead that the definition of the crime had been broadened by an amendment passed by the 92d Congress in 1972, P.L. 92–539, 86 Stat. 1070, to expand protection of foreign officials and other "official guests" of the United States. *See* S.Rep. No. 92–1105, 92d Cong., 2d Sess. 1, *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 4316. The full text of the statute as then amended is set forth in the margin.[12] While the clarity of the description of the federal offense as kidnapping followed by interstate transportation was blurred, there is nothing in the history of the amendment to indicate an intention to convert the statute into a proscription of interstate transportation in order to accom-

11. *See also United States v. Atchison,* 7 Cir. 1975, 524 F.2d 367, 370 n. 4, *quoting Gawne v. United States,* 9 Cir. 1969, 409 F.2d 1399, *cert. denied,* 1970, 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed.2d 123 ("the true elements of the offense are an unlawful seizure and holding, followed by interstate transportation").

The Fifth Circuit's formulation of the elements of kidnapping under the statute is not materially different. *See United States v. McBryar,* 5 Cir. 1977, 553 F.2d 433, *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136; *Hattaway v. United States,* 5 Cir. 1968, 399 F.2d 431 ((1) transportation in interstate commerce; (2) of an unconsenting person who is (3) held "for ransom or reward, or otherwise"; (4) such acts being done knowingly and willfully).

12. "**§ 1201. Kidnaping**

"(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

"(1) the person is willfully transported in interstate or foreign commerce;

"(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

"(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(32) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(32)); or

"(4) the person is a foreign official as defined in section 1116(b) or an official guest as defined in section 1116(c)(4) of this title,

shall be punished by imprisonment for any term of years or for life.

"(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce.

"(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."

plish a later kidnapping. The Senate Judiciary Committee noted that the law was amended "to make the thrust of the offense the kidnapping itself rather than the interstate transporting of the kidnapped person." *Id.* U.S.Code Cong. & Admin.News at 4317–4318. In the section-by-section analysis of the bill, the report explained:

> In lieu of the sole jurisdictional base of transportation in interstate or foreign commerce jurisdiction to punish kidnapping is provided when (1) the victim is transported in interstate or foreign commerce (*as under existing law*) (2) the kidnapping occurs within the special maritime and territorial jurisdiction of the United States, or (3) in the special aircraft jurisdiction of the United States; or (4) the victim is a foreign official within the purview of section 1116 of title 18.

*Id.* U.S.Code Cong. & Admin.News at 4326 (emphasis supplied). The Secretary of State and the Attorney General of the United States shared this view of the impact of the new legislation. *See id.* U.S. Code Cong. & Admin.News at 4323. Thus, the 1972 amendments expanded federal statutory jurisdiction over kidnapping and made the kidnapping rather than interstate transportation the heart of the offense but it did not alter the definition of the federal crime, as described in *Chatwin,* for kidnappings that do not take place within the special maritime, territorial or aircraft jurisdictions of the United States, or do not involve foreign officials, internationally protected persons, or official agents of the United States. *Compare, e.g., United States v. Young,* 4 Cir. 1975, 512 F.2d 321, *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (kidnapping at Washington National Airport).[13]

The alleged plan did not encompass taking or holding Villanueva against his will and then transporting him in foreign commerce. The government has never contended that Villanueva was to be detained involuntarily in any fashion before he was to be transported in foreign commerce. The contention that the statute was violated when McInnis and Parada conspired to cause Villanueva to transport himself across an international line by a Lorelei-promise of a south-of-the-border meeting with Parada must fail for it lacks support either in the statute or the jurisprudence.

Under various statutes predicated on interstate commerce, defendants have been held responsible for causing the interstate or foreign transportation of a person or an article, even where the defendants have not done the transporting themselves. For example, the National Stolen Property Act, 18 U.S.C. § 2314, which prohibits, among other things, the transporting in interstate commerce of goods taken by fraud, has been held to reach the action of a defendant who, by presenting a check drawn on a California bank for payment in a Texas bank, thereby "caused" the check to be transported in interstate commerce since it was reasonably foreseeable that in the ordinary course of business the Texas bank would use the mails to collect a check drawn on a California bank. *Pereira v. United States,* 1954, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435, 444. Similarly, prison inmates who caused others to ship narcotics in interstate commerce were held to have violated 18 U.S.C. § 1952, which provides that "[w]hoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to" further unlawful activities violates the section. *United States v. Levine,* 10 Cir. 1972, 457 F.2d 1186. In the same vein, a defendant who induced an automobile salesman to drive a stolen car across state lines violated 18 U.S.C. § 2312, which proscribes the interstate transportation of stolen vehicles, even though the salesman was unaware that the automobile was sto-

**13.** Other amendments to the kidnapping act have not made material changes in § 1201(a)(1) or (c). *See, e.g.,* H.Rep. No. 94 1614, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 4480, 4483 (accompanying P.L. 94–467, 90 Stat. 1997, providing criminal penalties if the victim of a kidnapping is an internationally protected person and for attempted kidnapping of foreign officials, internationally protected persons, and official guests); S.Rep. No. 2820, 84th Cong., 2d Sess., *reprinted in* [1956] U.S.Code Cong. & Admin. News, pp. 4373, 4374 (accompanying P.L. 84–983, 70 Stat. 1043, authorizing the FBI to investigate kidnappings if the victim has not been released within 24 hours after seizure).

len. *United States v. Leggett*, 7 Cir. 1959, 269 F.2d 35, *cert. denied*, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 156. In none of those cases did the defendants physically participate in the interstate transportation element of the offense, but in each case some instrumentality was employed by the defendant to "cause" interstate movement— for example, the postal service, *Pereira, supra;* an accomplice, *Levine, supra;* or an innocent agent, *Leggett, supra.* No case has been cited in which causation has been imputed because the victim transported himself.

Moreover, the interstate travel in each case occurred after some significant and unlawful step had been taken toward the commission of the federal offense—for example, the fraudulent receipt of a check, *Pereira, supra* ; the establishment of an illegal business enterprise, *Levine, supra* ; or the theft of an automobile, *Leggett, supra.*

The federal anti-kidnapping statute similarly contemplates situations where an offender "*unlawfully* seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds" the victim, and then transports him in interstate or foreign commerce. 18 U.S.C. § 1201 (emphasis added). In contrast to the cases cited to this court where the interstate transportation followed some illegal activity, McInnis and Parada did not contemplate any unlawful act before Villanueva crossed the international boundary. It is true that Parada attempted to "decoy" Villanueva into Mexico, but, prior to his arrival in Mexico, no unlawful interference with Villanueva's actions was intended.

The kidnapping statute thus fits into a common statutory model for federal offenses that premise federal jurisdiction on the offender's unlawful exercise of control over a person or object followed by the interstate transportation of that person or object. *See* The National Comm'n. on Reform of Federal Criminal Laws, Study Draft of a New Criminal Code 14 (1970). *See, e.g.,* 18 U.S.C. §§ 2312, 2314. The racketeering statute, 18 U.S.C. § 1952, involved in *Levine, supra,* deviates from this pattern only insofar as it premises federal jurisdiction on the interstate travel of or use of interstate facilities by an offender in furtherance of certain illegal activities. The proposed Federal Criminal Code provisions would broaden the kidnapping statute to fit that model by permitting federal prosecution of kidnapping if the offender crosses interstate or national boundaries to commit the offense. The National Comm'n. on Reform of Federal Criminal Laws, *supra*, at §§ 201, 1634. Even that broad jurisdictional base would not reach the conduct of McInnis and Parada who planned neither to cross state or international borders themselves nor to follow the abduction of Villanueva with international travel. The government's theory in this case would invert the sequence of events contemplated by the anti-kidnapping statute by allowing a victim's unrestrained and uncoerced crossing of state or national boundaries, when followed by his abduction, not only to serve as the basis for federal jurisdiction of the offense but also to constitute an element of the crime.

We have held the statute might be violated if the interstate transportation was accomplished at the direction of the defendant by a victim forced to comply, involuntarily, with his wishes, but this was on the thesis that transportation brought about as a result of the defendant's threats was in effect accomplished by the defendant. In *Bearden v. United States*, 5 Cir. 1962, 304 F.2d 532, *vacated on other grounds,* 1963, 372 U.S. 252, 83 S.Ct. 875, 9 L.Ed.2d 732, *rev'd on rehearing,* 320 F.2d 99, *cert. denied,* 1964, 376 U.S. 922, 84 S.Ct. 679, 11 L.Ed.2d 616, an airplane hijacker ordered the pilot to fly to the plane's original destination. After reconsideration at the direction of the Supreme Court, 372 U.S. 252, 83 S.Ct. 875, 9 L.Ed.2d 732, a panel of this court reversed the conviction and granted a new trial, finding that not instructing the jury that the defendant had to be "doing the transporting himself" was a "fundamental error." 320 F.2d at 103.

The Eighth Circuit Court of Appeals has twice held that the anti-kidnapping statute proscribes the decoying or inveigling of a victim to accompany the defendant in interstate commerce. *See United States v.*

*Hoog,* 8 Cir. 1974, 504 F.2d 45, *cert. denied,* 1975, 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437; *Miller v. United States,* 8 Cir., 1943, 138 F.2d 258, *cert. denied,* 1944, 320 U.S. 803, 64 S.Ct. 429, 88 L.Ed. 485. We cannot subscribe to this extension of the act to reach the entirely voluntary act of a victim in crossing a state line even though it is induced by deception.

There is still truth in ancient wisdom and law in maxims older than, but respected by, the Constitution. Criminal statutes are to be strictly construed. *E.g., United States v. Enmons,* 1973, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379, 389; *United States v. Dudley,* 5 Cir. 1978, 581 F.2d 1193, 1197. Penal statutes must not be stretched to enable the government to prosecute a defendant merely because what he has done is vile, or, as the government here suggests, a violation of state law that is likely to go unpunished by state authorities. The district court correctly concluded that the indictment should be dismissed because the conduct alleged was not what Congress forbade by the statute. Because of the conclusion we have reached, it is unnecessary to consider the further issue that the statute does not reach a conspiracy that would reach fruition only on foreign soil.

## B. *Perjury*

■ The district court believed that the grand jury was without jurisdiction to consider the alleged conspiracy to kidnap because the conduct exposed did not constitute a federal offense. The experienced trial judge was misled by the defendants into a false equation of what actually constitutes a crime with jurisdiction to investigate to determine whether an offense has been committed. The grand jury has a unique investigative function in our system of criminal justice. It is a "fair method for instituting criminal proceedings." *Cosby v. United States,* 5 Cir. 1979, 601 F.2d 754, 758, *quoting Costello v. United States,* 1956, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397, 401. *See also United States v. Calandra,* 1974, 414 U.S. 338, 342–46, 94 S.Ct. 613, 617–19, 38 L.Ed.2d 561, 568–570. Because it is an investigatory agency, and because its primary function is to safeguard defendants from prosecution without probable cause, not to aid the government, the grand jury must necessarily be able to investigate activities that it might later decline to indict. *See In re Grand Jury Proceedings,* 5 Cir. 1977, 558 F.2d 1177, 1179. A grand jury might, following an investigation, decide that a federal offense had likely been committed but refuse to return an indictment; it might decide that the conduct investigated was a state, but not a federal crime, or that the actions were not criminal. Unless the grand jury has such latitude, there is little reason for its existence, and it would be incapable of protecting citizens by exercise of its independent judgment. *See United States v. Shaw,* 5 Cir. 1977, 555 F.2d 1295, 1300 ("The historic task of the grand jury is to inquire into the existence of possible criminal conduct and to return only well-founded indictments").[14]

The plot brought to the attention of the grand jury might have turned out to be a federal crime. The tapes and the other evidence might have revealed that McInnis and Parada planned to take Villanueva to Mexico themselves, or even that the Mexican police officer planned to bring Villanueva across the border. Nothing came to pass, but this was in part because the hare was himself secretly a hound. However, since the grand jury was investigating conduct that might have been a federal crime it had jurisdiction to call witnesses who could shed light on the events in question.[15]

14. Other circuits have reached the same conclusion about the extent of grand jury authority. *E.g., United States v. Williams,* 8 Cir. 1977, 552 F.2d 226, 230 *quoting United States v. Sisack,* 9 Cir. 1976, 527 F.2d 917, 920 ("The mere possibility that violations of federal law have occurred is sufficient authority for a grand jury investigation."); *United States v. Jacobs,* 7 Cir. 1976, 543 F.2d 18, 21, *cert. denied,* 1977, 431 U.S. 929, 97 S.Ct. 2632, 53

L.Ed.2d 244 ("The mere possibility that the grand jury would not find conduct indictable . . . would not deprive it of authority to investigate to see whether indictable offenses had been committed.").

15. Of course, speculation in this opinion does not prove the scope of the grand jury investigation or the materiality of the witnesses' statements. These tasks are for the government at

█ The district court also noted that the manner in which the defendants were brought before the grand jury violated "the doctrine of fundamental fairness and the guidelines of the Justice Department." However, the courts are not charged with enforcing internal governmental guidelines and will not remedy an alleged violation by the dismissal of an indictment, *Hayes, supra*, 589 F.2d at 818, or the exclusion of evidence, *Caceres, supra*, —— U.S. at ——, 99 S.Ct. at 1473, 59 L.Ed.2d at 745.

█ If prosecutorial conduct is so fundamentally unfair as to deny a defendant's constitutional rights, dismissal of the tainted indictment is warranted. *See, e.g., United States v. Graves*, 5 Cir. 1977, 556 F.2d 1319, *cert. denied*, 1978, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516; *United States v. McCord*, 1974, 166 U.S.App.D.C. 1, 15–17, 509 F.2d 334, 348–51, *cert. denied*, 1975, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87. In this case, the government's attempts to conceal its investigation from the defendants because of McInnis's status as a law enforcement officer may have been ill-considered; however, its conduct, which we have outlined fully in note 4, did not cross the constitutional line.

The district court also relied upon what it found to be abuse of the grand jury process. The court referred to the policy reasons enunciated in *United States v. Doss*, 6 Cir. 1977, 563 F.2d 265, to justify its dismissal of the perjury counts. In *Doss*, the court found that the defendant's rights to due process and to counsel were violated by the questioning of a witness before the grand jury on a matter for which he had already been indicted by that body. *Accord, United States v. Mandujano*, 1976, 425 U.S. 564, 594, 96 S.Ct. 1768, 1785, 48 L.Ed.2d 212, 232 (Brennan, J., concurring). However, the court noted the "distinction of great moment between grand jury questioning of a witness (even one who might subsequently be indicted) and grand jury questioning of

an indicted defendant on the subject of the crime with which he is charged." *Doss, supra*, 563 F.2d at 278. The prosecutor and the grand jury may have thought it likely that McInnis and Parada would be indicted; however, there is no evidence in the record that the indictment had actually been issued at the time that the two testified.[16] Indeed, the testimony of McInnis and Parada might have persuaded the grand jury not to indict them or the grand jury might have concluded eventually as we have, that the conduct they planned was not a federal offense. "A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *United States v. Cuesta*, 5 Cir. 1979, 597 F.2d 903, 921 *quoting United States v. Stone*, 2 Cir. 1970, 429 F.2d 138, 140.

In short, we cannot agree that the perjury indictments should have been dismissed as a matter of law. The government must be given the opportunity to prove at trial that the defendants were guilty as charged.

## IV. Conclusion

For the reasons discussed above, the motion to dismiss the appeal is DENIED; the dismissal of the conspiracy to kidnap count of the indictment is AFFIRMED; and the dismissal of the perjury counts is REVERSED. The case is REMANDED for trial of the perjury counts only.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

trial. *E.g., United States v. Cosby*, 5 Cir. 1979, 601 F.2d 754, 757.

**16.** We note, however, that McInnis and Parada testified on the morning of June 7, 1978, the same day that the first indictment (for conspir-

acy to kidnap only) was filed. The filing stamp does not indicate the precise time of filing. We assume, without deciding, that the indictment was prepared and filed after McInnis and Parada testified to the grand jury.