UNITED STATES of America, Appellee,

v.

Daniel B. HUGHES, a/k/a "Sonny", Appellant.

No. 82–5082.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1982.

Decided Aug. 25, 1983.

Rehearing and Rehearing En Banc Denied Oct. 13, 1983.

Gene W. Gardner, Huntington, W.Va. (Lafe C. Chafin, Barrett, Chafin, Lowry & Hampton, Huntington, W.Va., on brief), for appellant.

S. Benjamin Bryant, Asst. U.S. Atty., Huntington, W.Va. (David A. Faber, U.S.

Atty., Charleston, W.Va., on brief), for appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and GORDON *, Senior District Judge.

GORDON, Senior District Judge:

Daniel B. Hughes was convicted in the United States District Court for the Southern District of West Virginia on a jury verdict that he was guilty of kidnapping Penny Lynn Childers, in violation of 18 U.S.C. § 1201(a). On this appeal Hughes contends that his conduct did not amount to a violation of the federal kidnapping statute, and that the trial court should not have permitted Childers' in-court identification of Hughes as her assailant. Finding no error, we affirm.

## I.

The evidence at trial established that in the early evening of Sunday, July 27, 1980, thirteen year old Penny Childers was riding her bicycle on a street near her home in downtown Huntington, West Virginia. As she cut across a service station parking lot, someone in a pickup truck that was stopped at a nearby intersection blew the horn at her. The driver then turned his vehicle around and followed as she sped up and turned down an alley that led to her home. She stopped as he pulled up beside her and identified himself as "Sammy Hughes." [1]

The two talked in the alley approximately ten to twenty minutes, Childers sitting on her bike and Hughes, whom Childers had not previously met, sitting in the drivers seat of his truck. Their conversation principally concerned a girlfriend of Childers, Marsha Nelson,[2] who lived in nearby Burlington, Ohio, and perhaps her brother, Har-

---

* The Honorable Eugene A. Gordon, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

1. Childers addressed this individual as "Sammy" throughout their encounter. He responded to this name and never indicated to her that she was addressing him incorrectly.

2. Childers testified that earlier that evening she had formed the idea of asking Marsha to spend the night with her, but she did not know how to reach her friend by phone. She indicated that her later meeting with someone whom apparently could put her in contact with Marsha was simply a coincidence.

ry Nelson. Hughes "acted like" he knew Marsha.[3] Hughes then agreed to drive Childers across the Ohio River to Burlington to visit Marsha, and after Hughes helped put her bicycle into the back of the pickup, she entered the cab.

Further, the trial testimony established that Hughes drove around downtown Huntington for ten or fifteen minutes, and then he crossed a bridge into Chesapeake, Ohio. At the first turnoff outside Chesapeake toward Burlington, he turned off the highway onto Tallow Creek Road, which led to a small cemetery.[4] When Childers asked why they had left the main road, Hughes said that he had to meet a friend. He parked the truck near the cemetery, and after sitting quietly for a minute or so he beat Childers savagely.

## II.

The initial issue is whether Hughes need have formed his intent to kidnap Childers prior to crossing the state line.[5] If the statute requires nothing more than that the kidnapping be completed sometime during or soon after a journey involving interstate

**3.** Appellant's trial testimony was that someone else talked with, and later beat, Childers that night. He denied ever using the name "Sammy." He also testified that he did not know a Marsha Nelson, although he did know of a Harry Nelson in Burlington. The jury, however, credited Childers' identification of her assailant, and we find no reason to upset that determination. *See* Part III, *infra.*

**4.** Hughes testified that he was familiar with the location of the cemetery.

**5.** If Hughes' intent from the beginning was to kidnap Childers, and he misled her into believing that he would take her to her girlfriend's house, then his action satisfies the "inveigle" alternative of the statute, and Childers' induced misapprehension of his intent negates the contention that she entered his vehicle willingly. *See* Part IIA, *infra.*

**6.** Prior to the 1972 amendments § 1201(a) read as follows:

(a) Whoever knowingly transports in interstate or foreign commerce, *any person who has been* unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor,

transportation of the eventual victim, then the evidence is indisputably sufficient to support a jury determination that Hughes intentionally seized, confined, and beat Childers against her will as an adjunct of the journey from West Virginia to Ohio.

If, on the other hand, the offense must be complete prior to the state line crossing, then we must also decide whether the facts of this case will support a reasonable inference that Hughes inveigled Childers into crossing into Ohio for the purpose of assaulting her. We believe that the kidnapping must occur prior to the interstate transportation.

### A.

■ Appellee's argument that the statute requires only a loose connection between the confinement and the line crossing rests upon the proposition that the 1972 amendments to 18 U.S.C. § 1201(a), Pub.L. 92–539, changed the previous federal law that plainly required a confinement against the will of the victim prior to the interstate transportation.[6]

by a parent thereof, shall be punished (1) by death if the kidnapped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or, (2) by imprisonment for any term of years or for life, if the death penalty is not imposed. (emphasis supplied).

Following the 1972 amendments § 1201(a) now reads as follows:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(1) the person is willfully transported in interstate or foreign commerce;

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(36) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(36); or

(4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title.

shall be punished by imprisonment for any term of years or for life.

The legislative history of this amendment indicates that the purpose of the change was to expand the jurisdictional base of the statute. *See United States v. Lewis,* 662 F.2d 1087 (4th Cir.1981). The Senate Judiciary Committee report noted that:

> In lieu of the sole jurisdictional base of transportation in interstate or foreign commerce jurisdiction to punish kidnapping is provided when (1) the victim is transported in interstate or foreign commerce (*as under existing law*) (2) the kidnapping occurs within the special maritime and territorial jurisdiction of the United States; or (4) the victim is a foreign official within the purview of section 116 of title 18.

1972 U.S.Code Cong. & Admin.News 4316, 4326. (emphasis supplied). The Senate report also explained that the amendment was intended "to clearly differentiate the question of what is criminal from the question of what criminal behavior falls within federal jurisdiction...." *Id.* at 4318.

Thus, although the offense of kidnapping is complete by the unwilling confinement, by any of the enumerated means, of an individual who is held for ransom, reward, or otherwise, federal jurisdiction over that offense attaches only upon an "interstate transporting of the kidnapped person." *Id.* The legislative history is clear that the 1972 amendments, in expanding jurisdiction, did not alter the established requirement that the criminal activity precede the interstate movement.

In addition, an expansive interpretation of the amendment is inconsistent with federal policy. The amendment was designed merely to provide concurrent federal jurisdiction over "those acts committed against public and foreign officials which interfere with [the] conduct of [national] domestic and foreign affairs," with primary responsibility for the investigation, prosecution, and punishment of kidnapping remaining in the several states. 1972 U.S.Code Cong. & Ad. News at 4323. Specifically, the amendment was intended to remedy defects in the traditional interstate transportation jurisdiction as applied to international terrorism or hijacking situations. *Id.* at 4322–23.

This express federal policy is not furthered, however, by permitting federal jurisdiction over a wholly intrastate kidnapping simply because during some relevant time period prior to the kidnapping the eventual offender and his victim crossed a state line. Such a situation involves no attempt to escape the jurisdiction in which the offense occurred, and, therefore, it provides no reason for departing from the long established framework of federalism that allocates to the states the primary responsibility for prosecuting kidnapping violations.

The Fifth Circuit has reached this conclusion in *United States v. McInnis,* 601 F.2d 1319 (5th Cir.1979). That case involved a scheme by the defendants to decoy the victim into voluntarily transporting himself into Mexico, where he would then be abducted. After analyzing the legislative history of the 1972 amendments, the court concluded that the alteration had merely expanded the federal jurisdictional base and had not changed the definition of the federal offense. 601 F.2d at 1325.

Nevertheless, the Court reversed the defendants' convictions on kidnap conspiracy charges on the ground that the "plan did not encompass taking or holding [the victim] against his will and then transporting him in foreign commerce." 601 F.2d at 1325. The Court found that defendants had intended no unlawful interference with the victim's actions prior to his arrival in Mexico, and without some unlawful exercise of control over the victim prior to the interstate transportation, no jurisdiction existed under 18 U.S.C. § 1201(a). 601 F.2d at 1326.

Although that situation is factually distinguishable from the instant case, since the victim in *McInnis* transported himself into Mexico, rather than the defendants transporting him, the Court extended its holding in that case to include all situations involving an "entirely voluntary act of a victim in crossing a state line even though it is induced by deception." 601 F.2d at 1327; *see United States v. McRary,* 665 F.2d 674 (5th

Cir.1982) (no foreign commerce jurisdiction when kidnapping not manifest until after three-mile limit crossed). We believe that the better position is that of the Eighth Circuit, which has held that a kidnapping victim who accepted a ride from someone who misled her into believing that she would be taken to her desired destination was "inveigled" or "decoyed" within the meaning of the federal kidnapping statute. *United States v. Hoog,* 504 F.2d 45, 51 (8th Cir.1974); *Davidson v. United States,* 312 F.2d 163, 166 (8th Cir.1963).

■ Just as we have failed to find a difference on policy grounds between a purely local kidnapping and one preceded by an otherwise innocent state line crossing, we likewise are unable to distinguish between a case in which the victim knows her captor's intentions from the start and one in which her status becomes manifest only once the crucial border is traversed. The policy justification for the original federal kidnapping statute was to provide federal officials the "power to disregard [state] barriers in pursuing" kidnappers who planned their activities to take the best possible advantage of the limited authority and coordination of state law enforcement agencies. *Chatwin v. United States,* 326 U.S. 455, 463, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946).

Nothing in this policy, however, justifies rewarding the kidnapper simply because he is ingenious enough to conceal his true motive from his victim until he is able to transport her into another jurisdiction. The barrier to effective state pursuit is as great in the former situation as it is in the latter.

While it is true that the Court in *Chatwin* warned against applying the federal kidnapping statute to "general transgressions of morality involving the crossing of state lines" and that lacked the "involuntariness of seizure and detention which is the very essence of ... kidnapping," 326 U.S. at 464, 66 S.Ct. at 237; that case involved "a situation quite different from the general problem to which the framers of the Federal Kidnapping Act addressed themselves."

326 U.S. at 462, 66 S.Ct. at 236. *Chatwin* cannot be read, however, as implying that a situation indisputably having all the other attributes of a kidnapping nevertheless falls short of the offense because the abductor used deceit and trickery to accomplish his purpose rather than overt force.

By inducing his victim by misrepresentations to enter his vehicle and to accompany him, and knowing that the victim's belief as to their purpose and destination is different from his actual illicit purpose, the kidnapper has interfered with, and exercised control over, her actions. We find this conduct sufficient to satisfy the "involuntariness of seizure and detention" requirement of *Chatwin.*

### B.

■ This Court must now determine whether Hughes' conduct reasonably met the standard established above; that is, whether the evidence is sufficient to support the jury's determination that Hughes formed his intent to kidnap Childers prior to their reaching Ohio. The relevant question in this inquiry "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

Of course, as in most cases in which state of mind is in issue, Hughes' intent during the relevant period can be inferred only from circumstantial evidence. The probative force of circumstantial evidence is no different from that of direct evidence in this situation, and there is no requirement that it must exclude every reasonable hypothesis other than that of guilt. *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

In this case the evidence establishes that Hughes twice attempted to initiate contact with Childers, and that he turned his vehicle around and followed her down an alley when his first effort failed. When Hughes

finally attracted Childers' attention, he introduced himself using a false name, and he failed to correct her use of it although she called him "Sammy" throughout their conversation. Also, Hughes misrepresented his acquaintance with Marsha Nelson, deceiving Childers into believing he knew her girlfriend, and thus encouraging an attitude of familiarity and trust on her part. Finally, immediately after crossing into Ohio, Hughes chose the first opportunity to reach a secluded location, again lying to Childers about the purpose of their detour.

 Although taken in isolation, each bit of this evidence may be insufficient to support the jury's verdict, the proper construction is to view the evidence together as a coordinated and interrelated whole. *United States v. Harris*, 435 F.2d 74, 89 (D.C.Cir.1970). Taken together this evidence demonstrates that from the beginning Hughes was not open and honest in his dealing with Childers, but rather he was completely false and deceitful. Such conduct is inconsistent with an innocent intent and may be considered as circumstantial evidence of guilt. *See United States v. Strickland*, 509 F.2d 273, 276–77 (5th Cir. 1975); *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194 (D.C.Cir.1974) ("Secrecy or openness in the involved transaction are clear indicators of guilty intent or its absence.") This pattern of deceit by Hughes was designed to gain Childers' confidence, and it supports an inference that his actions were simply an attempt to get her into his truck for the purpose, later demonstrated, of assaulting her.[7]

Additional circumstantial evidence of Hughes' guilt comes from his own statements. Hughes' defense at trial rested upon the contention that someone else abducted and beat Childers. His alibi was that he had not felt well that Sunday evening and had remained home and watched a movie on television. Although he testified

at trial that he had seen only the first segment of the movie that night, (R. at 101)[8] and had watched the conclusion the following night (Monday), he had previously testified that he had seen the entire movie on Sunday evening (R. at 111–14; 171–72).

Hughes also testified that a friend of the family, Tom Duncan, had been at his house most of Monday evening during the time the second part of the movie would have been televised (R. at 102–03; 105–07). Duncan was an investigator in the state prosecutor's office, and he had come to the residence to question Hughes about his whereabouts the previous evening. Hughes recalled that Duncan had been at his house about two hours, that they had spent about fifteen minutes talking about his activities the previous evening, and that they had spent the remainder of the time watching the end of the movie (R. at 105–07).

Duncan, however, testified that he had been at the Hughes' home approximately forty-five minutes, and that he spent most of the time talking with Hughes about the Childers case (R. at 167, 169, 174). He did not recall the television being on during the conversation, and he stated that Hughes told him that he had seen the end of the movie on the previous night (R. at 170–73).

Finally, Hughes originally told investigators on two different occasions that he had been out drinking beer with a friend earlier Sunday evening (R. at 103–04, 107–08, 170). He later changed this story, however, when he discovered that this friend had been in jail on that date (R. at 107–08). At trial he said that he did not recall that he had been drinking beer that Sunday night (R. at 98).

 This inconsistent testimony, coupled by Childers' positive identification of Hughes as her assailant, is sufficient to justify the jury's conclusion that his alibi was false. Fabrication of evidence by a defendant or false explanations that will aid his defense are clearly admissible to

---

7. That Childers initially suggested that Hughes take her to Ohio does not weaken this inference; it merely demonstrates the success of his tactics.

8. All references to "R." are to pages in the Record on Appeal, volume IX, which is volume II of the official transcript of Hughes' trial on November 23–25, 1981.

prove his guilty state of mind. *United States v. Wilkins,* 385 F.2d 465, 472 (4th Cir.1967) *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1144 (1968). Thus, evidence that Hughes' alibi was fabricated was properly considered by the jury as probative evidence of his illicit intent. *United States v. Abney,* 508 F.2d 1285, 1286 (4th Cir.) *cert. denied* 420 U.S. 1007, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975).

▮ We do not contend that the evidence in this case is so overwhelming that no trier of fact could reasonably doubt Hughes' guilt. Our standard of review is a narrow one, however, and does not require removal of all possibility that some jury might have a reasonable doubt about the defendant's guilt; nor does it require that this Court determine whether *it* believes the evidence establishes guilt beyond a reasonable doubt. *Jackson v. Virginia, supra* 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *United States v. Quarles,* 387 F.2d 551, 554 (4th Cir.1967) (citing *Bell v. United States,* 185 F.2d 302 (4th Cir.1950)).

▮ Perhaps other explanations of the appellant's behavior are possible, although he chose to rely exclusively upon his alibi and none was offered. We find merely that the evidence in this case is sufficient to take it to the jury, permitting a reasonable jury "to consider these opposing possibilities and to draw the appropriate inferences." *United States v. Harris, supra,* at 91.

### III.

Hughes also contends that Childers' identification of him at trial should have been suppressed. The appellant argues that the identification was inherently unreliable, and, particularly, that two photographic displays, from which Childers' selected Hughes' photo, were unduly suggestive.

▮ Whether an in-court identification is so unreliable so as to require suppression of the identification is determined according to the totality of the circumstances. *Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (adopting factors in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). The evidence reveals some disparity between Childers' description of her attacker and Hughes' appearance, but those differences are not so great, standing alone, that suppression would be required. In fact, her description overall cannot be said to be a generally poor or inaccurate description of the appellant. The proper approach in this situation is not suppression, but to encourage defendant's counsel to bring these inconsistencies to the attention of the jury in closing argument, and thus lessen the impact of the identification on the jury panel's minds.

▮ The circumstances of the photo displays do not tip the scales to require suppression. "Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photo identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). While the conditions under which these photos were displayed may not have been ideal, the circumstances of this case fall far short of the "very substantial likelihood of irreparable misidentification" standard that is required. Based on the totality of the circumstances, we are confident that the in-court identification was properly admitted.

### IV.

Reasonable persons may differ over the proper interpretation of the evidence in this case. Because the resolution of disputes necessarily involves human beings who must labor in the uncertain realm of inference and probability, legal process is not, nor can it hope to become, an exact science. It is a strength of our legal system, however, that a lay jury is given the responsibility fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. To properly accomplish this task it should, and must, employ its accu-

mulated everyday experience with people and events.

Based on its deliberations in this case, the jury determined that the evidence pointed to guilt beyond a reasonable doubt. The question was properly one for the jury, and its determination will not be disturbed.

AFFIRMED.

WIDENER, Circuit Judge, concurring:

I

Presuming that the kidnapping statute, 18 U.S.C. § 1201, is construed in the way Judge Gordon's opinion construes it, I concur in his opinion in all respects, for I think there was not only ample, but a great abundance of, evidence that Hughes intended to kidnap this young girl from the moment he first saw her and indicated his interest in her and in the events which followed by blowing his horn at her. The jury was fully entitled to believe that his relation of the incident, including his alibi, was not true in all but insignificant details, as there was evidence it was not in many.

II

It will serve no useful purpose to further elaborate at length on the legislative history of the statute which we considered in *United States v. Lewis*, 662 F.2d 1087 (4th Cir.1981), *cert. den.* 455 U.S. 955, 102 S.Ct. 1464, 71 L.Ed.2d 672 (1982), in which we construed the 1972 amendments to § 1201(a).

Initially, I call attention to the fact that the wording of the statute was changed.

Prior to 1972 the operative part of the statute with which we are dealing here provided that:

"Whoever knowingly transports in interstate ... commerce, any person who has been unlawfully ... kidnapped...."

Following the 1972 amendments, the same part of the statute provides that:

"Whoever unlawfully ... kidnaps ... any person ... when ... the person is willfully transported in interstate ... commerce."

Thus, prior to the amendments, the statute required a victim who *has been* kidnapped; following the amendments, the statute requires a victim who *is* willfully transported. The former statute may easily be construed to require a kidnapping *prior* to interstate transportation. The present statute only requires the *present* interstate transportation of a kidnapped person. This change of wording is entirely consistent with the way I think the statute should now be read.

Briefly, as noted, in 1972 Congress rewrote the federal kidnapping statute and added three alternative bases of federal jurisdiction over kidnapping. *See* Pub.L. No. 92–539, § 201, 86 Stat. 1070 (1972). In commenting on this change, the Senate Committee Report said that the amendments were intended to change the kidnapping law "to make the thrust of the offense the kidnapping itself rather than the interstate transportation of the kidnapped person." S.Rep. No. 1105, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4316, 4317–18. In *Lewis*, we considered the legislative history of the 1972 amendments and held that the federal kidnapping statute as amended creates one substantive crime of kidnapping with four alternative federal jurisdictional bases. *Id.* at 1089–90. Stated differently, we interpreted the 1972 amendments as separating the crime of kidnapping from the federal jurisdictional bases for prosecution. *Id.* at 1090.

The holding in *Lewis* is, I believe, controlling in this case. Because interstate transportation of the victim is intended to be merely a basis for federal jurisdiction rather than an integral part of the substantive crime, there is no present basis for reading into the statute a requirement that the intent to kidnap be formed before the victim is taken across the state line. In my view, the statute requires not more than that the intent to kidnap be formed, or be present, and the kidnapping occur (if it has not already occurred) some time during the journey that involves the crossing of a state line. It is not disputed that there was

sufficient evidence for the jury to find that at the cemetery Hughes intentionally seized and held Penny Childers against her will, and beat her, and that their presence at the cemetery was part of their interstate journey. I therefore would affirm the sufficiency of the evidence to support the conviction on that account alone.

MURNAGHAN, Circuit Judge, dissenting:

Regarding the purely legal question presented, namely, whether the kidnapping statute, 18 U.S.C. § 1201(a)(1), requires a relationship between the *misbehavior* and the interstate *travel* that supports federal criminal jurisdiction, I agree with the answer reached by the majority opinion. A relationship between the interstate travel and the kidnapping itself is required. There must be some unlawful interference by the defendant with the liberty of the victim which preceded, and which may be said to have facilitated in some way, the interstate travel. "The very nature of the crime of kidnapping requires that the kidnapper use some means of force—actual or threatened, physical or mental—in each elemental stage of the crime, so that the victim is taken, held, *and transported against his or her will.*" *United States v. Macklin,* 671 F.2d 60, 64 (2d Cir.1982) (emphasis supplied).[1]

For purposes of the case here, then, it was essential that the government establish that the defendant, Hughes, unlawfully interfered with the liberty of his victim, Miss Childers, at some point in time before the two crossed the bridge between Huntington, West Virginia, and Burlington, Ohio. The panel majority concludes that the

government succeeded in carrying its burden, advancing the theory that the essential element of proof can be found in Hughes' deceitful behavior towards Miss Childers. According to the panel majority's view of the case, the evidence is sufficient to support a finding that Hughes intended to visit harm upon Miss Childers and lulled her into a false sense of security in order to perfect his plan.

The Constitution, however, requires that every fact essential to the crime be proven beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). The evidence adduced by the government at trial simply was insufficient to permit a rational jury to conclude, beyond a reasonable doubt, that Hughes was possessed of an evil intent to harm Miss Childers before the interstate transportation was completed and, thus, fraudulently induced Miss Childers into taking or, at the least, into completing, the interstate journey.

What evidence there is does not establish that the criminal behavior and criminal intent related to the time frame before the bridge spanning the border between West Virginia and Ohio had been traversed. Consequently, for all the proof there was, those actions were exclusively restricted to the state of Ohio. Certainly the existence of a criminal intent before the bridge was crossed was not established beyond a reasonable doubt. The undisputed evidence shows that Miss Childers had formed the purpose of getting together with her friend, Marsha Nelson, well before she ever met the defendant. Whatever nefarious scheme one may suspect from Hughes' "picking up" of Miss Childers, there is nothing to suggest

---

1. Our decision in *United States v. Lewis,* 662 F.2d 1087 (4th Cir.1981), *cert. denied,* 455 U.S. 955, 102 S.Ct. 1464, 71 L.Ed.2d 672 (1982), does not detract from that conclusion. In *Lewis,* we held that the 1972 and 1976 amendments to § 1201, which added three additional jurisdictional bases, were intended to extend the scope of federal criminal jurisdiction but were not intended to convert what, in fact, was one single kidnapping into four separate crimes.

"[A]s amended, [§ 1201] creates a single crime with four jurisdictional bases rather than four different crimes." 662 F.2d at 1090.

The issue presented here is what relationship, if any, there must be between the acts of restraint, inveiglement or seizure of the victim and the jurisdictional predicate invoked by the government. The court in *Lewis* neither reached nor had occasion to reach that issue.

that he had any plans for which an Ohio locale was preferable to one in West Virginia. The evidence shows that Miss Childers, having met the defendant, was the one who introduced the topic of an interstate journey by voluntarily suggesting that he drive her to Ohio in order that she might, indeed, meet her friend. The two then drove, first around Huntington and then across the border into Ohio, in circumstances entirely devoid of any unpleasantness. It was not until later, after Hughes and Miss Childers had completed their interstate journey and after the two had, according to the testimony of Miss Childers, sat quietly for several minutes along a dark and secluded sideroad, that Hughes became violent. Nothing, nothing at all, points to any illegal intent on the part of Hughes prior to those moments immediately leading up to the assault. It is entirely likely that something Miss Childers then did, or, as probably, did not do was what brought about Hughes' violent actions and first brought into existence his plans to implement them.

The majority opinion, reaching a contrary conclusion, relies heavily upon a brief eight-line colloquy that took place during Miss Childers' testimony:

Q: When you asked this fellow if he would take you to your friend Marsha Nelson's house, did he agree?

A: Yes.

Q: Do you know whether or not Sammy Hughes [the assailant identified himself to Miss Childers as "Sammy Hughes"] knew Marsha Nelson?

A: He acted like he did.

Q: Did you talk while you were in the truck?

A: Yes.

Q: What did you talk about?

A: Mostly about Marsha and Harry [Nelson, Marsha's brother].

That colloquy, taken in conjunction with Hughes' admission that he did not know Marsha Nelson, is cited to support the proposition that a jury could have found that Hughes initiated the entire encounter with Miss Childers, deceived her into believing that he was an acquaintance of Marsha Nelson, and did so first to win Miss Childers' confidence and then to do her harm.

So much, however, cannot be constructed from so little in the way of evidence. Nowhere in the record is there evidence that Hughes in fact told Miss Childers that he knew Marsha Nelson. Nowhere in the record is there a claim by Miss Childers that she asked Hughes for a ride on the basis of any trust or faith she may have developed in light of a supposed friendship between Hughes and Marsha Nelson. Nowhere in the record is there evidence that Miss Childers at any time travelled in reliance upon the belief that Hughes knew Marsha Nelson. Nowhere in the record is there any evidence that the violence visited by Hughes on Miss Childers was contemplated at any time before they had crossed the bridge into Ohio. Hughes wanted Miss Childers in the truck all right, but nothing suggested that what he wanted had any Ohio advantage associated with it. The sole reason, so far as the record discloses, for the journey between West Virginia and Ohio was to satisfy Miss Childers's wish to visit a friend. Nothing suggests that the interstate movement, so far as Hughes was concerned, was anything more than an affirmative response to Miss Childers' request to be taken to Ohio.

No doubt the facts presented at trial could be depicted skillfully in a way to show that a non-illogical inference might be drawn against Hughes. But the Constitution demands proof beyond a reasonable doubt, and not merely evidence from which a chain of logically unprecludable yet nevertheless speculative inferences might be forged. Such speculation is precisely insufficient to support a verdict in a criminal trial. *See, e.g., United States v. Carter,* 522 F.2d 666, 681–82 (D.C.Cir.1975). The evidence, viewed as it must be in its totality, fails to refute—and indeed points

strongly toward—the inference that the interstate travel at issue here was entirely voluntary, and that the criminal behavior which subsequently occurred in Ohio is, thus, punishable not under the laws of the United States, but solely under the laws of Ohio.[2]

I in no way mean to condone the misbehavior of Hughes. However, we are to apply the law as it is, not reconstitute it in a way which might appear, in a single instance, more appropriate. There is a continuing tension between the authority of the individual states and the power of the central federal colossus. Congress, we can only assume, perceived the general political wisdom of leaving punishment in cases not involving forced transportation in interstate commerce to the courts and prosecutors of the individual states.

**2.** It is highly instructive to consider, by way of contrast, the two cases cited by the majority in support of its conclusion. Both cases featured strong reasons, supported by hard evidence, to believe that the defendant harbored an evil intent from the very beginning of his dealings with the victim and, indeed, induced the subsequent interstate transportation.

In *United States v. Hoog,* 504 F.2d 45 (8th Cir.1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975), the defendant and a compatriot raped three women after each of the victims had been transported in interstate commerce. Because the defendant's accomplice was awaiting the defendant and the victim at the scene of the eventual crime, the inference was inescapable that the transportation was part and parcel of a preordained plan to do wrong.

In *Davidson v. United States,* 312 F.2d 163 (8th Cir.1963), a forty-five year old man enticed a six year old female child to enter his car and drove her from one state into another and back again. Some time during the odyssey, he molested the child sexually. The tender age of the victim precluded an inference of voluntary travel, as the *Davidson* court acknowledged in its effort to distinguish *Chatwin v. United States,* 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946), the landmark Supreme Court decision which held that transportation voluntary on the part of the victim, there a fifteen year old girl, could not give rise to a conviction under the federal kidnapping statute.

Unlike those cases, we are not presented here with special facts that point ineluctably to the conclusion that the victim's apparently voluntary travel across state lines was, in reality, less than voluntary. Indeed, the government— in both its brief and oral argument before this panel—took the position that Miss Childers freely initiated the idea of a drive to Ohio and, most important, freely accepted Hughes' accession to her request.