**UNITED STATES of America Plaintiff,**

v.

**Jay E. LENTZ, Defendant.**

**No. CR. 01–150–A.**

United States District Court,
E.D. Virginia.
Alexandria Division.

Aug. 7, 2003.

Steve Mellin, Esquire, Assistant United States Attorney, United States Attorney's Office, Patricia Haynes, Esquire, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, Plaintiff's Counsel.

Frank Salvato, Esquire, Michael Liberman, Esquire, United States Public Defender's Office, Alexandria, VA, Defendant's Counsel.

## AMENDED OPINION

LEE, District Judge.

THIS Matter is before the Court on Defendant's Motion for Judgment of Acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The issue before the Court is whether the evidence is sufficient to sustain a conviction on Count I of the Indictment, which charges defendant Jay E. Lentz ("Jay Lentz") with kidnapping resulting in the death of his ex-wife, Doris Lentz ("Ms. Lentz"), in violation of 18 U.S.C. § 1201.[1] The critical

---

1. There are two accepted spellings of "kidnapped" and its variants. *See, e.g.,* Webster's College Dictionary 729 (2d ed.2001) (noting as correct "kidnapped" and "kidnaped," for example); *compare U.S. v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (citing the Federal "Kidnaping Act") *with Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (citing the Federal "Kidnapping" Act). In 1994, the statute was amended to use "kidnapped" and its variants. *See* Pub.L. No. 103–322 (codified as amended in 18 U.S.C. § 1201(a)). It is unclear how the amendment affected the title of the Act. The style used herein is employed in an effort to be in conformance with the most recent opinions issued by the Fourth

question before the Court is whether the government produced sufficient evidence to submit to the jury that Jay Lentz "kidnapped" Ms. Lentz, held her for ransom or otherwise and that her death resulted. There is no evidence Jay Lentz held or detained Ms. Lentz as a part of a kidnapping. This fatal flaw requires the Court to grant the Defendant's Motion for Judgment of Acquittal and to dismiss this case.

## I. BACKGROUND

### A. The Disappearance of Ms. Lentz

Ms. Doris Lentz disappeared April 23, 1996. Several of Ms. Lentz's friends and co-workers and Ms. Lentz's mother testified at trial that Ms. Lentz told them that she was going to her ex-husband, Jay Lentz's home to pick up her daughter, Julia Lentz ("Julia"), on April 23, 1996. Several days after her disappearance, Ms. Lentz's car was found abandoned with blood stains and her personal effects inside. Five years later, the federal government charged Jay Lentz with kidnapping resulting in death in connection with Ms. Lentz's disappearance. Defendant's trial began on June 2, 2003, more than two years after he was originally indicted.

The government's theory of the case was that Jay Lentz set out to commit the perfect crime, to murder his wife so he would not have to pay child support and other payments in connection with a contested divorce. The government argued that the evidence showed that Jay Lentz used his four-year-old daughter as a lure to attract his ex-wife to his home while their daughter was out of town so he could murder her and dispose of the body. The government argued that Jay Lentz arranged for

Julia to visit Julia's paternal grandparents in Indiana and that Ms. Lentz could pick the child up after the grandparents' visit on Tuesday, April 23, 1996, at Jay Lentz's home in Fort Washington, Maryland. Evidence adduced at trial showed that the child flew to Indiana alone without her father and that her return flight was set for Saturday, April 27, 1996, not April 23, 1996. The government's evidence showed that Ms. Lentz told her best friend, her co-workers and relatives that she was going to pick up her daughter at Jay Lentz' home on April 23, 1996.

The government further argued that Jay Lentz lured his ex-wife over to his house under the pretense that Ms. Lentz was coming to pick up their daughter after her return from Indiana. Upon Ms. Lentz's alleged arrival at Jay Lentz's home, the government maintains that Jay Lentz killed Ms. Lentz; wrapped her body in a large blue tarp; stuffed her body into the front passenger seat of her own car; drove the car to an undisclosed location where he dumped the body; and abandoned the car in Washington, D.C., making it look like foul play was involved.

The police, FBI, friends, and family of Ms. Lentz conducted numerous searches near Jay Lentz's home, in an effort to recover her body. Unfortunately, Ms. Lentz's body has never been recovered, and she has not been seen or heard from since April 23, 1996. On April 24, 2001, the Defendant was charged in a three-count Indictment.[2] Count One charges Jay Lentz with Kidnapping Resulting in the Death of Ms. Lentz, in violation of 18 U.S.C. § 1201(a). Count Two charges Jay Lentz with Kidnaping in violation of the

---

Circuit, which now uses "Federal Kidnapping Act."

**2.** On the day of closing arguments in Jay Lentz's trial, the government moved to dismiss Counts II and III of the Indictment. Jay

Lentz did not object to their dismissal, as long as the counts were dismissed with prejudice. The Court granted the government's Motion, and Counts II and III were dismissed with prejudice.

same statute. Count Three charges Jay Lentz with Interstate Domestic Violence in violation of 18 U.S.C. § 2261(a)(2), *i.e.*, causing a spouse or partner to travel across state lines by force or coercion with the intent to commit a crime of violence injuring the spouse or partner.

*B. The Evidence at the Close of the Government's Case in a Light Most Favorable to the Government*

■ On a Rule 29 Motion for Judgment of Acquittal a court must view the facts in a light most favorable to the government. In this light, the Court finds that the following facts were established throughout the course of Jay Lentz's trial.

Jay Lentz and Ms. Lentz were married in 1989. In 1991, their daughter, Julia, was born. The marriage was rocky. There were periods of marital discord leading to their separation in 1993. Jay Lentz was deployed in the Persian Gulf overseas during Operation Desert Storm. When he returned, the marriage was ending. The marital discord continued, and the police were called to the Lentz residence at least once to quell a domestic argument.

Rev. Lauren Gough, a clergy person at Ms. Lentz's former church, testified that Jay Lentz and Ms. Lentz had previously sought marriage counseling from her. Rev. Gough testified that Ms. Lentz was so afraid to tell Jay Lentz that she wanted a divorce that she had requested Rev. Gough, and Rev. Gough agreed, to be present at their home when she told Jay Lentz she was leaving him. Rev. Gough testified that the Defendant's reaction to this bad news was "very controlled, yet tense reaction to the news." Rev. Gough said that shortly thereafter Jay Lentz asked Rev. Gough to leave. However, on cross-examination, Rev. Gough conceded that she had never seen any bruises on Ms. Lentz, even when she saw Ms. Lentz several weeks after she told Jay Lentz that she wanted a divorce.

The parties separated in January 1993. Ms. Lentz's first divorce attorney, Ms. Cheryl Hepfer, testified that Ms. Lentz left the marital home on January 5, 1993.

Soon after Ms. Lentz moved out of the marital home, she temporarily relocated back to her mother's home in Tennessee. The couple's divorce was resolved by the Maryland court in July 1995; however, there were issues of child support and division of marital property remaining before the court.

Ms. Lentz' divorce lawyer, Ms. Hepfer, testified that Ms. Lentz was entitled to half of the couple's property under Maryland law. The parties did not have a lot of assets to divide. The marital home was the largest asset. The divorce was contentious. The parties fought hard about marital share of the equity in the home and child support. During the divorce, there were many angry exchanges of words, notes, and telephone messages. Ms. Hepfer and a second divorce lawyer testified that Jay Lentz's challenges to Ms. Lentz's view of her entitlements made the divorce attorney's fees exceed the value of the equity in the home. Additionally, Ms. Hepfer stated that Jay Lentz was recalcitrant and that he consistently refused to provide relevant discovery information freely to aid in the division of the assets. Ms. Hepfer testified that he had problems paying his child support payments on time and that he owed Ms. Lentz back child support. The evidence revealed that Mr. Lentz was delinquent in the payment of child support. In April 1996, a Maryland Court found that the Defendant was in arrears for $572.00. However, Ms. Lentz claimed the delinquent amount to be $3,882.00. During the trial, Ms. Bonnie Butler, Ms. Lentz's second divorce attorney, testified that the Defendant owed

$4,500.00 in back child support to Ms. Lentz, and ultimately the Maryland Circuit Court applied a wage garnishment to his pay to have the payments deducted from his paychecks, in the amount of $465.00 per month.

The government called several witnesses to testify that Ms. Lentz was afraid of the Defendant, and to show various statements Jay Lentz made demonstrating his hatred of Ms. Lentz.

Sometime after relocating to Tennessee, Ms. Lentz decided to return to Arlington, Virginia, to live. According to Mr. Tim O'Brien, Ms. Lentz's boyfriend at the time of her disappearance, Ms. Lentz's fear of Jay Lentz caused her to choose the apartment building where she lived because of the safety features that it offered. Mr. O'Brien testified that Ms. Lentz parked in a controlled-access underground garage, that the building also had controlled access, that she informed the building management not to allow Mr. Lentz up to her apartment, and that the two parents would exchange Julia downstairs in the lobby.

The government called Ms. Hepfer and Ms. Butler, Ms. Lentz's first and second divorce attorneys, respectively, to testify about their knowledge of Ms. Lentz's fear of Jay Lentz. Ms. Hepfer testified that she knew that Ms. Lentz taped all of her telephone conversations with Jay Lentz.

Ms. Laura Munson, a close friend of Ms. Lentz's, also testified that one time Ms. Lentz came to her home after an argument with Jay Lentz where Ms. Lentz told her that Jay Lentz assaulted her. Ms. Munson took pictures of Ms. Lentz's arms which showed bruises. Ms. Munson stated that the Defendant called her house looking for Ms. Lentz because he thought that his wife might be staying at Ms. Munson's place because of the argument.

Ms. Ruth Chauvin, a former occupational health nurse at the Senate Building, where Ms. Lentz used to work before the parties divorce testified as well. Ms. Chauvin testified that Ms. Lentz came to her office and that she noted bruises on Ms. Lentz's arm on one occasion. Ms. Chauvin became friends with Ms. Lentz over the course of Ms. Lentz's employment at Senator James Sasser's office.

Mr. Kevin McSwain, a Prince George's County Police Officer, testified that in August 1991, he was called to the Lentzs' house for a report of a domestic assault on Ms. Lentz, and that he noticed Ms. Lentz had bruises on her arms.

Mr. George Stevens, a close friend of Ms. Lentz's from church, testified that on one occasion, Ms. Lentz asked him and another male friend if they would accompany her to Jay Lentz's home because she was afraid to go over there alone to pick up her daughter. Mr. Stevens testified that in the spring of 1996, he accompanied Ms. Lentz to Jay Lentz's home to pick up Julia. During that visit, Mr. Stevens said that Jay Lentz told him, "I don't know what kind of lies Doris [Lentz] has been telling you about me." Other than that statement, Mr. Stevens reported no other incident during that trip, but he testified about his knowledge of Ms. Lentz's fear of Jay Lentz.

Ms. Jennifer Rigger, a close friend of Ms. Lentz, is very familiar with Julia and Ms. Lentz. Ms. Rigger testified that she was aware of Ms. Lentz and Jay Lentz's ongoing divorce proceedings from her conversations with Ms. Lentz.

Ms. Rigger testified that at Ms. Lentz's request, she was in the lobby of Ms. Lentz's apartment building on the evening of April 16, 1996. Jay Lentz had come to Ms. Lentz's building to pick up Julia because she was scheduled to leave for her grandparents' home the next morning. Ms. Lentz had asked Ms. Rigger to be present to witness Jay Lentz signing a form concerning their divorce, which he refused to sign.

During that conversation in the lobby, Ms. Rigger testified that she heard Jay Lentz tell Ms. Lentz that Julia would be returning from Indiana the following Tuesday, April 23, 1996.

Ms. Rigger spoke to Ms. Lentz on the telephone twice on Tuesday April 23, 1996, and Ms. Rigger testified that Ms. Lentz told her several times that Julia was scheduled to return home that night. Ms. Rigger stated that they spoke around 6:50 that evening, when Ms. Lentz said that she had to leave her home in Virginia to go to Jay Lentz's home to pick up Julia. Ms. Rigger also stated that Ms. Lentz said if she was late Jay Lentz would be angry.

The government called many other witnesses to testify that Ms. Lentz had told them that Julia was scheduled to return home on Tuesday, April 23, 1996, and that Ms. Lentz was going to Jay Lentz's home to pick up her daughter. For example, Ms. Bernice Butt, Ms. Lentz's mother, said that Ms. Lentz had spoken on several occasions excitedly of Julia's expected return on April 23, 1996. The government also called Mr. O'Brien, Ms. Rigger, and Ms. Faye Osteen, Ms. Lentz's aunt, to testify that Ms. Lentz had told each of them that she was going to Jay Lentz's home to pick Julia up on the night of April 23, 1996.

There is no physical evidence that Ms. Lentz actually arrived at Jay Lentz's home on the night of April 23, 1996. There were no witnesses who observed Ms. Lentz arrive at Jay Lentz's home or that saw her in his presence. There was no blood from Ms. Lentz found at Jay Lentz's home. In fact, the only evidence from the trial that Ms. Lentz arrived at all is an evidentiary inference from the many statements of Ms. Lentz's friends, who testified that Ms. Lentz told them she was going to Jay

Lentz's home to pick up Julia on April 23, 1996, and a key piece of testimony from Ms. Marilyn Sauder.

Ms. Sauder lived in Fort Washington, Maryland, near Jay Lentz, and she used to babysit for Julia on occasion, at his request. Ms. Sauder testified that she was speaking to Jay Lentz shortly after the news broke that Ms. Lentz had disappeared. Ms. Sauder testified that in response to one of her questions to Jay Lentz about Ms. Lentz's disappearance, he told her that Julia was out of town visiting with his parents. Ms. Sauder said that Jay Lentz told her that Ms. Lentz called him and told him she was going to come to his house on April 23, 1996, to pick Julia up after she returned from Indiana. Ms. Sauder further testified that Jay Lentz said that he told Ms. Lentz not to come over to his house that evening because Julia had not yet returned from Indiana, due to a ticketing mishap, but that Ms. Lentz had come to his home anyway. This admission by Jay Lentz that Ms. Lentz had come to his house on April 23, 1996, despite his allegedly telling her not to come, is the only piece of evidence that places Ms. Lentz at Jay Lentz's home on the night that she disappeared.

An undisputed fact throughout the trial was that Ms. Lentz and Jay Lentz were involved in a ongoing divorce proceeding and scheduled to appear in divorce court in Maryland on April 24, 1996 for a status hearing where the court would inquire whether the parties had settled the case. Ms. Lentz was aware of the court date. Ms. Butler, Ms. Lentz's attorney at that time, testified that she had called Ms. Lentz to remind her of the April 24, 1996, court appearance, and a tape recording of that message which she left on Ms. Lentz's answering machine[3] was played for the

**3.** Several tape recordings of telephone messages and telephone conversations between Jay Lentz and Ms. Lentz were played for the

jury to show the animus between the parties concerning divorce and child support issues.

jury. Ms. Butler testified that Ms. Lentz had never previously missed a court appearance or a meeting, and that she was generally a very dependable, reliable, and punctual person. However, Ms. Lentz did not appear.

Ms. Sherrie Roske, a secretary who worked with Jay Lentz at the time of Ms. Lentz's disappearance, testified that on April 24, 1996, the day of the court hearing, Jay Lentz came into work after noon looking very disheveled, with bags under his eyes, as if he had not slept at all the night before. Ms. Roske also stated that she heard Jay Lentz tell someone that the authorities would never find Ms. Lentz if they continued to look for her in his backyard. Ms. Roske also said that she heard Jay Lentz say that he thought Ms. Lentz might have been carjacked. Ms. Roske later testified that on a prior occasion, Jay Lentz had told her that he would kill his ex-wife before he allowed her to have custody of Julia. However, Ms. Roske's testimony was very much in dispute because there was no mention of any report by Ms. Roske to the police of this threat in any of the police officers' interview notes. Additionally, the question of whether the statement about child custody was made is unclear because there was no issue of child custody pending between the parties at the time. The Lentzes had agreed to joint custody of Julia, and a visitation schedule was in place well before Ms. Lentz's disappearance.

Mr. James Neal, Jay Lentz's postman, testified that Jay Lentz requested that mail stop being delivered to his home indefinitely on April 24, 1996.

In the spring of 1996, Jay Lentz was in the process of trying to sell the marital home, and Ms. Diane Ives was Jay Lentz's real estate agent. Ms. Ives testified that Fort Washington is a hidden gem neighborhood and that Defendant's home was in a desirable location near Fort Washington Park.

In preparation for sale, Ms. Ives recommended that Jay Lentz paint the interior of the house, in addition to making other cosmetic changes. Ms. Ives testified that Jay Lentz called her on April 22, 1996, and left a message for her to remove the lockbox from the front door of his home until the following Saturday because he intended to paint the home and did not want to be disturbed by potential buyers. Ms. Ives, who testified that she kept a journal of "contemporaneous notes" for every client, testified that she went to Defendant's home on April 22, 1996, to remove the lockbox. When she arrived at the house, she decided to enter the home and noticed a large blue tarp in the front portion of the house, but she did not see any paint or painting supplies anywhere in the house.

Ms. Ives also testified that, according to her notes, she returned to Jay Lentz's home on Saturday, April 27, 1996, to put the lockbox back on the door, and she called and left a message to that effect for him. Ms. Ives stated that Jay Lentz called her back that same day and again told her to remove the lockbox. When Ms. Ives went back to the home to remove the lockbox, she stated that she again went into the home to see if it had been painted, and it had not. She also noticed that the blue tarp had been removed, and she noticed a $1 \times 3$ foot square of fresh gray paint on the floor of the carport. After reviewing her notes, Ms. Ives stated that she had never told Jay Lentz to paint the carport floor.

On April 29, 1996, Ms. Ives returned to the house again and noticed that the block of paint on the carport floor had been enlarged to approximately $3 \times 6$ feet. By May 10, 1996, when Ms. Ives was again at Jay Lentz's home, she noticed that the

back third of Jay Lentz's driveway had been painted gray but that Jay Lentz never painted the interior of the house, as he had indicated he would. Ms. Ives also testified that before Ms. Lentz disappeared, Jay Lentz told her that he was going to be out of town in southern Virginia during the week of April 27, 1996.

Several days after Ms. Lentz disappeared, Arlington County Police Detective Cindy Brenneman and Officer Jim Andresakes drove past Jay Lentz's home and noticed Jay Lentz washing the floor of his carport with a garden hose. Jay Lentz's home did not have an enclosed garage; rather, it had an open carport, which was fully visible from the road.

On April 27, 1996, Arlington County Police Sergeant Jane Morris went to Jay Lentz's home to interview him about Ms. Lentz's disappearance. Sergeant Morris testified that she informed Jay Lentz that he was a suspect in Ms. Lentz's disappearance. Mr. Lentz did not invite the officer into his home in part because he was informed that he was a suspect in Ms. Lentz's disappearance. Mr. Lentz talked to Sergeant Morris on his front porch. Sergeant Morris also stated that in response to her questions Jay Lentz told her that the route that Ms. Lentz likely traveled from her office to his home was either on South Capitol Street or Livingston Road. During the interview Jay Lentz asked if the authorities had located Ms. Lentz's car or her purse. Sergeant Morris testified that during their initial conversation, Jay Lentz told her that he had last spoken to Ms. Lentz on April 23, 1996, between 5 and 6 p.m. However, the government played a tape of a message left on Sergeant Morris' voicemail after business hours, wherein Jay Lentz told the detective that he had thought more about their interview and that he last talked to Ms. Lentz around 6:50 p.m. on April 23, 1996.

Ms. Lentz's car was found abandoned in a parking lot of an apartment building. Ms. Lajuan Best testified that she called Virginia authorities on April 28, 1996, to report a car with Virginia license plates that had been sitting for several days in a parking lot across from her apartment building in Southeast Washington, D.C. Ms. Best testified that the parking lot where the car was found, off of Livingston Road, was known to contain stolen cars, and she further testified how the crime rate in that neighborhood had escalated around that time.

Sergeant Morris and Detectives Brenneman and Robert Carrig went to investigate the car on April 28, 1996, and they later determined that the abandoned car belonged to Ms. Lentz. The officers noted that the car doors were unlocked, the keys were on the floor of the passenger side, and there appeared to be blood stains on the floorboard of the passenger side, the passenger seat, the brake pedal and clutch, the front passenger's seat belt, the carpet floor on the passenger side, and what appeared to be a bloody napkin on the floor of the passenger side. Ms. Lentz's black purse was also in the car. Testimony also revealed that the driver's seat was slid back from the steering wheel to the furthest position, and there were two umbrellas in the back seat of the car, one for an adult and one for a child.

Testing was conducted on evidence taken from the car, including the stained napkin, the stains on the car's floorboard, and the passenger seat, the seat belt, and both the brake and clutch pedals. The parties stipulated that Ms. Lentz's blood was present in the car.

The government's DNA expert, Mr. Robert Scanlon, Forensic Scientist II with the Virginia Department of Forensic Sciences, testified that he found a stain the size of a quarter on the center of the

passenger seat of Ms. Lentz's car that he concluded contained Jay Lentz's DNA. Mr. Scanlon further testified that Jay Lentz could not be eliminated as the possible donor of a sample from the recline lever of the passenger seat. However, he acknowledged on cross-examination that he has no evidence how the blood stain was placed on the seat. Mr. Scanlon further acknowledged that the blood could have been placed in the car by "secondary transfer," which occurs when DNA is transferred from the donor to another person or item, and is then deposited onto its final resting destination, from where it is finally extracted and tested.

At the close of the government's case-in-chief, Jay Lentz made a Motion for Judgment of Acquittal, based on Federal Rule of Criminal Procedure 29, asserting that there was insufficient evidence of "holding" to support the case being submitted to the jury on a charge of kidnapping resulting in death. The Court took the motion under advisement, and the trial proceeded. At the close of the trial, Jay Lentz again renewed his Rule 29 Motion for Judgment of Acquittal, and the Court kept the motion under advisement while the jury deliberated. The jury convicted Jay Lentz on Count I: kidnapping resulting in the death of Ms. Lentz. The Court now reaches the merits of Jay Lentz's Rule 29 Motion.

## II. STANDARD OF REVIEW

Rule 29 states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a).

■ The Court took the Motion for Judgment of Acquittal under advisement and let the case proceed to verdict because Rule 29 permits the trial court to balance the defendant's interest in immediate resolution of the motion against the interests of the government in proceeding to verdict, thereby preserving the government's right to appeal in the event a guilty verdict is returned but then is set aside by the granting of a judgment of acquittal. Under the double jeopardy clause, the government may appeal the granting of a judgment of acquittal only if there is no necessity for another trial. *See* Fed. R.Crim.P. 29(b), (c) (2); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 568, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977).

■ The standard of review for a motion filed under Rule 29 is whether, viewing the evidence in the light most favorable to the prosecution, and giving all benefit of reasonable inferences to the government, "any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Evans–Smith v. Taylor,* 19 F.3d 899, 905 (4th Cir.1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). *See also Goldsmith v. Witkowski,* 981 F.2d 697, 701 (4th Cir.1992) (holding that in determining whether there was sufficient evidence for a conviction, the evidence must be viewed in light most favorable to the government); *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982) (holding that in a Rule 29 Motion, the Court must accord the benefit of all reasonable inferences to the government).

■ An essential component of due process demands that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of *every* element of the offense." *Jackson,* 443 U.S. at 316, 99 S.Ct. 2781 (emphasis added) (referencing *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068,

25 L.Ed.2d 368 (1970) (holding that "[i]t is the duty of the Government to establish . . . guilt beyond a reasonable doubt")).

The Fourth Circuit opined that the *Jackson* test "was adopted to provide an additional safeguard against [the possibility that juries may convict even when no rational trier of fact could find guilt beyond a reasonable doubt], and was to give added assurance that guilt should never be found except on a rationally supportable 'state of near certitude.' " *Evans–Smith,* 19 F.3d at 906 (quoting *West v. Wright,* 931 F.2d 262, 268 (4th Cir.1991)), *rev'd on other grounds,* 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (quoting *Jackson,* 443 U.S. at 315, 99 S.Ct. 2781).

■■ Post *Jackson* and *Winship,* "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 318, 99 S.Ct. 2781. It is not for the Court to decide whether *it* believes the evidence is sufficient to find guilt beyond a reasonable doubt; rather, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original).

The specific issue in the motion before the Court is whether the evidence adduced in the government's case-in-chief, taken in the light most favorable to the government, supports a finding by a rational trier of fact that Jay Lentz *held* Ms. Lentz in a manner sufficient to satisfy the Federal Kidnapping Act.[4] To understand the complexity of this question, it is first necessary

to examine the Federal Kidnapping Act itself and the events that preceded its passage and subsequent amendment. Next, the government and defense positions on whether holding was proved in the instant case are discussed. Finally, we analyze whether the holding required by the Federal Kidnapping Act was shown.

## III. THE FEDERAL KIDNAPPING ACT AND HOLDING

### A. The Federal Kidnapping Act

The Federal Kidnapping Act was passed in response to the sensational March 1932 kidnapping of aviator Charles Lindbergh's 20–month–old son from the boy's New Jersey nursery. *See* Britenae M. Coates, *The Fourth Circuit's New Interpretation of the Federal Kidnapping Act in United States v. Wills and the Resulting Expansion of Federal Jurisdiction,* 80 N.C. L.Rev.2041, 2044–45 (2002) [hereinafter *New Interpretation* ]. Over the next two months, the kidnappers sent 13 ransom notes, leading the Lindberghs to pay over $50,000 for the return of their son. *See id.* at 2044 n. 16. Despite the Lindbergh's payments, their son was never returned; he was found dead from a blow to the head. *See id.*

At the time of the Lindbergh baby kidnapping, kidnapping was increasingly common. Sophisticated criminals were planning kidnappings meticulously, selecting their victims from the social elite, demanding ransom and using the lack of coordination between law enforcement agencies to avoid prosecution. *See Chatwin v. United States,* 326 U.S. 455, 462–63, 66 S.Ct. 233, 90 L.Ed. 198 (1946). The Federal Kidnapping Act was passed on June 22, 1932, in response to the Lindbergh Baby kidnapping, and has been amended numerous times since its original passage. *See New*

---

**4.** Jay Lentz does not challenge the sufficiency of the evidence of inveiglement, interstate

transportation or death. .

*Interpretation* at 2045 n. 19. Most notably, in 1972 Congress amended the Federal Kidnapping Act to expand its jurisdictional component. *See* Pub.L. No. 92–539, § 201 (1972). Specifically, the 1972 amendment provided federal jurisdiction when the victim was transported in interstate commerce. *See United States v. Hughes* 716 F.2d 234, 238 (4th Cir.1983). The Federal Kidnapping Act was amended again in 1998 to provide that jurisdiction lay when a person is transported in interstate commerce, regardless of whether the person was alive when the state boundary was crossed, so long as the person was alive when the transportation began. *See* Pub.L. No. 105–314, § 702(a) (1998).

■ Currently, the Federal Kidnapping Act, 18 U.S.C. § 1201(a) provides:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when-

(1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began;

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49;

(4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or

(5) the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties,

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment. To establish a violation of the Federal Kidnapping Act, "the government must prove that: 1) the victim was seized, confined, inveigled, decoyed, kidnapped, abducted *or* carried away; 2) the victim was held; and 3) federal jurisdiction." *United States v. Wills*, 234 F.3d 174, 177 (4th Cir.2000) (emphasis in original). Numerous courts have made clear that unlawful seizure and holding are the essential elements of a kidnapping. *See United States v. Young*, 512 F.2d 321, 323 (4th Cir.1975). It is the requirement that the victim be held that is central to the case at bar.

■ Under the Federal Kidnapping Act, there are seven ways to satisfy the first element: seizing, confining, inveigling, decoying, kidnapping, abducting or carrying away a person. "Holds" is not another in the seven alternative means listed for seizing the victim; rather, it is "an *additional* element that must be established in every case." Wayne R. LaFave, 3 Subst. Crim. L. § 18.2 (2d ed.) (emphasis in original).

■ The holding element of the Federal Kidnapping Act "has received surprisingly little attention" from the courts. *Id.* Generally, to "hold" means to detain, seize, or confine a person in some manner against that person's will. *Lentz*, Crim. No. 01–150–A, Jury Instruction No. 23. Holding "implies an unlawful physical or mental restraint" or confinement accomplished through "force, fear or deception." *Chatwin*, 326 U.S. at 460, 66 S.Ct. 233. As long as holding is shown, it is not necessary that the government prove that the

holding occurred prior to the transportation in interstate commerce; however, the holding must be separate from the transportation. *Lentz*, Crim. No. 01–150–A, Jury Instruction No. 25.

### B. The Government's Position on Holding [5]

The government argues that Ms. Lentz was held by Jay Lentz in two ways.[6] First, it argues Ms. Lentz was held when she was inveigled into traveling to Jay Lentz's home. Second, it argues Ms. Lentz was held when she was murdered.

First, the government asserts that unaccompanied inveiglement satisfies the holding element of the federal kidnapping statute. *United States v. Wills*, 234 F.3d 174 (4th Cir.2000). *Wills* stands for the proposition, according to the government, that the central question in a kidnapping case is whether the kidnapper "interfered with, and exercised control over" the victim's actions; such interference, if found, constitutes holding. The government asserts that Jay Lentz used the ruse of luring Ms. Lentz to pick up their daughter, Julia, in order to get Ms. Lentz to come to Jay Lentz's home and, in doing so, exercised control over Ms. Lentz's actions. Moreover, Jay Lentz's deception constitutes "mental restraint" and, therefore, holding of Ms. Lentz pursuant to *Chatwin.* 326

U.S. at 455, 66 S.Ct. 233; *see also Hughes*, 716 F.2d at 234; *Young*, 512 F.2d at 323.

Second, the government asserts that Ms. Lentz was held during her murder[7] and that that detention constitutes holding under the Federal Kidnapping Act.[8] The government argues that there is evidence that Ms. Lentz arrived at Jay Lentz's home. Ms. Sauder testified, for example, that Jay Lentz told her that Ms. Lentz came to his home to pick up Julia after he told Ms. Lentz not to come because Julia had not yet returned from Indiana. Furthermore, it argues that the presence of Jay Lentz's blood in Ms. Lentz's car suggests a struggle attendant to Ms. Lentz's alleged murder.

Finally, the government contends "it is absurd to suggest that a holding relating to the very purpose of the kidnapping— that is, the murder of the victim may not be considered in determining whether the holding element of the crime was established." The government cites no case law in support of its proposition that the holding incidental to murder is sufficient to satisfy the kidnapping statute. Instead, it argues that the instant prosecution "is a paradigmatic use of the federal statute."

### C. The Defense Position on Holding [9]

Jay Lentz argues that there is no evidence of the holding necessary to sustain a

---

**5.** *See Government's Response to Court's Questions Relating to Rule 29*, at 2–6. All citations in this section are replicated as used by the government in its response.

**6.** The government does not argue that the transportation of Ms. Lentz's body constitutes holding under the statute.

**7.** The government seemed to switch theories mid-trial as to where the murder took place. Before the instant motion was made, the government appeared to be asserting that the murder took place in the open carport, the floor of which Jay Lentz's real estate agent, Ms. Ives, testified that Jay Lentz painted twice

shortly after Ms. Lentz's disappearance. In its closing, however, the government asserted that the disappearance of a sofa in Jay Lentz's home demonstrates Ms. Lentz was murdered inside Jay Lentz's home, wrapped in a blue tarp and dragged out to the carport, where blood leaked onto the carport floor.

**8.** "Doris [Lentz] was also physically held by Lentz during her murder." *Government's Response to Court's Questions Relating to Rule 29*, at 3.

**9.** *Defendant's Memorandum in Support of Motion Pursuant to Rule 29*, at 2–3. All citations

kidnapping conviction. Neither the unaccompanied inveiglement itself nor the holding incidental to the murder can satisfy holding as required by the Federal Kidnapping Act, he asserts.

First, Jay Lentz argues that the inveiglement in this case cannot satisfy the holding element of kidnapping because it was unaccompanied. What occurs during an accompanied inveiglement may be able to satisfy the holding element, he acknowledges, because the inveigler is in a position to use some type of force to ensure that the kidnapping is successful.[10] *See United States v. Boone*, 959 F.2d 1550, 1556 (11th Cir.1992). However, in this case, Jay Lentz was not with Ms. Lentz when she was inveigled; she was free not to show up at Jay Lentz's home at all or to bring someone with her. Therefore, Jay Lentz did not have "the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed." *Id.* at 1555. Moreover, the defense disagrees with the prosecution's reliance on *Wills*, which did not address any issue with respect to the holding element of the Federal Kidnaping Act. *See Wills*, 234 F.3d at 177 n. 5.

Second, Jay Lentz argues that the holding required under the Federal Kidnapping Act must be more than incidental to the crime of murder. Several circuits have addressed this issue and have found as much. *See United States v. Howard*, 918 F.2d 1529, 1536–37 (11th Cir.1990); *Government of Virgin Islands v. Berry*, 604 F.2d 221, 226–227 (3d Cir.1979); *see also United States v. Etsitty*, 130 F.3d 420, 427 (9th Cir.1997).

Jay Lentz relies primarily on *Berry*, the most prominent and cited decision on the issue of holding incidental to another crime. *Berry* sets out a four-part test to distinguish kidnapping from other offenses involving asportation or detention of a victim: 1) the duration of the detention or asportation; 2) whether the detention or asportation occurred during the commission of a separate offense; 3) whether the detention or asportation that occurred is inherent in the separate offense; and 4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense. *See Berry*, 604 F.2d at 227. The defense asserts that no element of the *Berry* test is satisfied, as there is no evidence of holding "at all."

Deconstructing and applying the opinions of our sister courts who have dealt with the contours of the Federal Kidnapping Act is difficult, to say the least. The boundaries of the Federal Kidnapping Act are amorphous. The Federal Kidnapping Act is subject, as the myriad decisions on it show, to at least as many legal interpretations as there are gruesome factual scenarios the Federal Kidnapping Act was designed to cover. These decisions, not surprisingly, often rest on factual distinctions not found in later cases. Moreover, the breadth of the statute leaves the courts struggling to walk the tightrope of trying to give the Federal Kidnapping Act the full effect intended by Congress, while restraining the large reach of the federal government from turning every domestic murder into a federal case when local prosecutors and state courts are fully capable of exercising their prosecutorial and adju-

---

in this section are replicated as used by the defense in its response.

**10.** We do not reach this issue today, as there is no allegation that the inveiglement was accompanied. However, it is important to

note that in the cases where a kidnapping by accompanied inveiglement has been upheld, holding, typically by deception, in addition to the inveiglement has been present. *See* discussion, *infra.*

dicative functions in such cases. Further complicating the decision at bar is that the element at issue, "holding," is not typically the element central to litigation of the Federal Kidnapping Act.

Nonetheless, in the instant case, it is clear that if, as Jay Lentz suggests, the government adduced no evidence of holding, his Rule 29 motion must be granted, as the government failed to prove an essential element of the crime. If, as the government suggests, holding was demonstrated either during the inveiglement itself or incidental to Ms. Lentz's death, the motion fails, as Jay Lentz does not argue that the government failed to produce evidence on the other elements of the crime.

 After reviewing the evidence in the light most favorable to the government, this Court holds that the government did not adduce evidence of "holding" sufficient to support a kidnapping conviction under the Federal Kidnapping Act. The Court holds that unaccompanied inveiglement cannot satisfy the holding element of kidnapping. Furthermore, the Court finds that there is no evidence of holding either incident to or separate from the alleged murder of Ms. Lentz.[11] Therefore, Jay Lentz's Rule 29 Motion for Judgment of Acquittal must be granted and this case must be dismissed.

## IV. WHETHER UNACCOMPANIED INVEIGLEMENT SATISFIES HOLDING

### A. Unaccompanied Inveiglement and the Wills Case

 The Federal Kidnapping Act makes inveigling one of the seven ways in which the first element of the kidnapping statute can be satisfied. To inveigle or decoy a person means to lure, entice or lead a person astray by false representations or promises, or other deceitful means. Lentz, Crim. No. 01–150–A, Jury Instruction No. 22.

 Inveiglement can either be accompanied or unaccompanied. The government, however, presented no evidence that either Jay Lentz or an accomplice was physically present with Ms. Lentz as she traveled from Virginia to Maryland ostensibly to pick up her daughter. Whether such "unaccompanied inveiglement," as it is called by several courts, is adequate either to confer jurisdiction or to satisfy the first element of the Federal Kidnapping Act, has been the subject of much legal wrangling.

The Fourth Circuit recently addressed the issue of unaccompanied inveiglement in Wills.[12] See 234 F.3d 174. Wills involved the inveiglement of the victim, Zabiuflah Alam ("Alam"), by the defendant, Christopher Wills ("Wills"), for the purpose of

---

**11.** The government did not argue that it had any evidence of holding separate from the inveiglement or the murder.

**12.** It is unclear where the holding is in Wills. The district court thought the government was arguing that "the Kidnapping Act can be violated where a defendant deceives the victim into crossing state lines alone and thereafter seizes and holds him." United States v. Wills, Crim. No. 99–396–A, 2000 WL 311188, at *2 (E.D.Va. March 17, 2000). In the government's appellate briefs, however, it is unclear whether the government asserts 1) that there was holding independent of the unac-

companied inveiglement and murder; 2) that the unaccompanied inveiglement was the holding; or 3) that the holding occurred during the murder. Compare Brief for the United States of America, at 2 (saying "inveigles and decoys the victim to transport himself from Virginia to Washington, D.C., and then holds and murders him after the interstate journey") with id. at 14 (asserting "Alam was held when he was murdered") and Brief for Appellee Christopher Andaryl Wills, at 7 (citing the Government Response to Pre–Trial Motions of Defendant as saying the victim "was held at the moment defendant induced Alam by false pretenses to leave his home").

preventing Alam from testifying against Wills in a burglary trial. *See id.* at 175. Wills left a phony flyer at Alam's home advertising a job opportunity. *See id.* Alam subsequently traveled unaccompanied from Virginia to Washington, D.C., for the purpose of participating in a bogus job interview. *See id.* at 176. Alam's automobile was found three days later. *See id.* His body was never located. *See id.* The issue presented to the Fourth Circuit was whether unaccompanied inveiglement was sufficient under the Federal Kidnapping Act to confer federal jurisdiction over the alleged crime. *See id.* The Fourth Circuit found that unaccompanied inveiglement was a sufficient basis for jurisdiction.[13]

In the instant case, there was ample evidence of unaccompanied inveiglement. Evidence was presented that Julia was sent by Jay Lentz to his parents' home in Indiana for a visit. The return date on the ticket was April 27, 1996. Nonetheless, several witnesses testified that Ms. Lentz told them she was going to pick up Julia on April 23, 1996, at Jay Lentz's home. At approximately 7 p.m. on April 23, Ms. Lentz got off the phone with Ms. Rigger in order to leave to pick up Julia at Jay Lentz's home. Ms. Lentz was never seen again. Although Jay Lentz has denied seeing Ms. Lentz that evening, Ms. Sauder testified that Jay Lentz admitted to her that Ms. Lentz came to his home the night of her disappearance.

It is clear that, taken in the light most favorable to the government, unaccompanied inveiglement was shown. Moreover, it is clear from *Wills* that unaccompanied inveiglement is adequate to confer federal jurisdiction and, presumably, to satisfy the first element of kidnapping under the Federal Kidnapping Act.[14] The government, however, also asserts that this unaccompanied inveiglement satisfies the holding element of the Federal Kidnapping Act. It is the government's position that *Wills* not only stands for the proposition that unaccompanied inveiglement is adequate to establish federal jurisdiction over the kidnapping, but that *Wills* *also* stands for the proposition that unaccompanied inveiglement satisfies both the first, or seizure, and second, or holding, elements of kidnapping as defined by the Federal Kidnapping Act. We disagree.

*Wills* did not address whether unaccompanied inveiglement was sufficient to constitute holding; in fact, it did not address the holding element of federal kidnapping at all.[15] The Fourth Circuit specified in *Wills* that the opinion addressed unaccompanied inveiglement only insofar as it is a basis for federal jurisdiction; therefore, the prosecution's reliance on *Wills* is misplaced. *Wills*, 234 F.3d at 177. Moreover, after applying the Fourth Circuit's method of statutory analysis of the Federal Kidnapping Act, as done in *Wills*, to the case at bar, it is clear that unaccompanied inveiglement itself cannot be used to satisfy

---

13. *See Wills*, 234 F.3d at 178 (addressing the language of § 1201(a)(1), the basis for jurisdiction). *But see United States v. McInnis*, 601 F.2d 1319, 1327 (5th Cir.1979) (finding that allowing voluntary interstate transportation to provide the jurisdictional link for coverage under the Federal Kidnapping Act would extend the Federal Kidnapping Act far beyond Congress' intent).

14. Jay Lentz does not argue that unaccompanied inveiglement is insufficient to satisfy the first element of the Federal Kidnapping Act.

15. *Wills*, 234 F.3d at 177 n. 5 ("No question is raised with respect to the language-'held for ransom or reward or otherwise.' "); *see also New Interpretation*, at 2050, 2061 (explaining that in *Wills*, the unaccompanied, inveigled victim was "met by the kidnapper, held *and* murdered after the victim crossed state lines" and *Wills* "opened up federal jurisdiction to include kidnappers who lure victims across state lines before exerting physical control over them.") (emphasis added).

both the seizure and holding elements of the Federal Kidnapping Act.

### B. Statutory Construction does not Support Unaccompanied Inveiglement as Holding

In *Wills*, the Fourth Circuit emphasized the importance of a plain text reading of the Federal Kidnapping Act.[16] *See Wills*, 234 F.3d at 176 ("Because we are of the opinion that *the plain text of the Federal Kidnapping Act* does not contain an accompaniment requirement, we reverse the district court's decision and remand for further proceedings consistent with this opinion.") (emphasis added). It explained that the "intent of Congress can most easily be seen in the text of the Acts it promulgates. Thus, any interpretation of a statute begins with the plain text." *Wills*, 234 F.3d at 178 (citing *United States v. Wells*, 519 U.S. 482, 490, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997)). Heeding the guidance given to us by the Fourth Circuit in *Wills*, we will thus begin our analysis of the Federal Kidnapping Act as applicable to the instant case with a plain text reading of the statute.

The Federal Kidnapping Act has three elements. It requires that: 1) that the victim was seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away *and* 2) held *and* 3) jurisdiction. *See* § 1201 (saying "Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away *and* holds for ransom or reward or otherwise...") (emphasis added). It is written in the conjunctive, not the disjunctive; an act of inveiglement *and* holding are *both* required.[17] If Congress intended to allow inveiglement to satisfy the additional requirement that a victim be held, it could have indicated such by either drafting the Federal Kidnapping Act in the disjunctive or specifying that additional holding was not required when inveiglement was shown. *See United States v. Hood*, 343 U.S. 148, 151, 72 S.Ct. 568, 96 L.Ed. 846 (1952) (asserting "[w]e should not read such laws so as to put in what is not readily found there") (cited with approval by *Wills*, 234 F.3d at 178). Congress did not do so, however. Moreover, if we were to read the Federal Kidnapping Act as allowing the inveiglement itself to satisfy the holding element, the holding element would be rendered impermissibly inoperative.[18] Making "either the first or the

16. The importance of textualism when analyzing statutes is a matter recognized by many distinguished jurists. *See, e.g.,* Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 22 (1997) (arguing "[t]he text is the law, and it is the text that must be observed").

17. *See id.* As Judge Luttig explained when analyzing a trademark statute, "section 1127 defines the term 'use in commerce' with respect to services as being when a mark is 'used or displayed in the sale or advertising of services *and* the services are rendered in commerce.' As a consequence of the *conjunctive* command, it is not enough for a mark owner simply to render services in foreign commerce for it to be eligible for trademark protection. Nor is it enough for a mark owner simply to use or display a mark in the sale or advertising of services to United States consumers. *Both* elements are required, and *both* elements must be distinctly analyzed." *Int'l Bancorp v. Societe des Bains de Mer*, 329 F.3d 359, 373 (4th Cir.2003); *see also Etsitty*, 130 F.3d at 428 (Kleinfeld, J., concurring) (noting that the Federal Kidnapping Act "implies that seizure and confinement of a person is not enough to establish the crime. The statute says 'seizes, confines ... *and holds.*' Meaning has to be given to the phrase 'and holds' beyond the conduct already denoted by 'seizes' and 'confines.'") (emphasis in original); *United States v. Howard*, 918 F.2d 1529, 1534–35 (11th Cir.1990) (refusing to find kidnapping where the detention shown was only as much necessary to commit a robbery).

18. *See United States v. Wilson*, 316 F.3d 506, 509 (4th Cir.2003) (Luttig, J.) (holding that a party must satisfy all requirements when

second condition [of the statute] redundant or largely superfluous [would be] in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (Blackmun, J.). We will not read the Federal Kidnapping Act so as to make it disjunctive when Congress plainly drafted it in the conjunctive or so as to render one of its elements superfluous.

### C. Supreme Court Precedent does not Support Unaccompanied Inveiglement as Holding

In addition to the plain text reading of the Federal Kidnapping Act, the foremost Supreme Court case on federal kidnapping and inveiglement does not support the government's argument that unaccompanied inveiglement satisfies the holding element of the Federal Kidnapping Act. In *Chatwin,* members of a fundamentalist Mormon cult convinced a young girl that plural marriage was essential to her salvation. *See* 326 U.S. at 457, 66 S.Ct. 233. The girl, who was mentally challenged, subsequently entered into a plural marriage with Chatwin. *See id.* When she became pregnant, her parents discovered the marriage and the girl was made a ward of the state. *See id.* at 458, 66 S.Ct. 233. She escaped state detention, returned to Chatwin, married him in Mexico, moved with him to Utah and remained there in hiding until discovered by authorities. *See id.* Chatwin was subsequently charged . with kidnapping. *See id.* at 459, 66 S.Ct. 233.

The Supreme Court, in reversing the kidnapping conviction, said it had "serious doubts" about whether the girl was inveigled. *Id.* at 459, 66 S.Ct. 233. The Supreme Court found it unnecessary to examine the evidence of inveiglement, however, because there was "a complete lack of competent proof that the girl was 'held for ransom or reward or otherwise' as that term is used in the Federal Kidnapping Act." *Id.* at 460, 66 S.Ct. 233.

The Court explained that holding implies "an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *Id.* On the facts in *Chatwin,* the Court found that nothing indicated that the girl was "deprived of her liberty, compelled to remain where she did not wish to remain, or compelled to go where she did not wish to go." *Id.* There was no proof that the petitioners "willfully intended through force, fear or deception to confine the girl against her desires." *Id.*

The significance of the *Court's* analysis in *Chatwin* is not only the guidance it provides as to what constitutes holding, but also that the Supreme Court bifurcated its analysis of the seizure and holding prongs of kidnapping under the Federal Kidnapping Act. The Court finds it unnecessary to examine whether the girl in *Chatwin* was inveigled because there was no evidence she was held. If the inveiglement itself, of which there was at least some evidence, could have satisfied the holding element under the Federal Kidnapping Act, the Court would have examined the evidence of inveiglement to see if it satisfied the holding element of kidnapping under the Federal Kidnapping Act. It did not do so, however, and we must infer then that the Court analyzed these elements separately because they are, in fact, separate. Therefore, we find that *Chatwin* supports the view that inveiglement and holding are two separate elements un-

those requirements are listed in the conjunctive to prevail); *United States v. Boone,* 959 F.2d 1550, 1555 (11th Cir.1992) (citing *Moun-*

*tain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985)).

der the Federal Kidnapping Act and that evidence of inveiglement cannot be used to satisfy the holding prong.

### D. Lower Court Precedent does not Support Unaccompanied Inveiglement as Holding

The necessity of "holding" in addition to and separate and apart from the initial

seizure of a kidnapping victim is not only evident from a plain text reading of the Federal Kidnapping Act and analysis of Supreme Court precedent; it has been clearly contemplated by several lower federal courts, including the Fourth Circuit.[19]

Although these cases involved accompanied inveiglement, they are instructive

**19.** In all of these cases, with the exception of *Wills* and *McInnis*, neither of which dealt with the "holding" requirement, the inveiglement is accompanied. *See Hughes*, 716 F.2d at 234 (finding that a man who tricked a young girl into getting into his car by saying he would take her to see her friend, drove her across state lines, held her by deceiving her about why they had left the main road and then savagely beat her had committed kidnapping); *United States v. Sellers*, 62 Fed. Appx. 499, 502–03 (4th Cir.2003) (finding there was sufficient evidence of seizure and holding to support kidnapping conviction); *Boone*, 959 F.2d at 1555–1557 (holding that the inveigler must have the willingness and intent to use physical or psychological means to complete the kidnapping in the event that his initial deception failed); *United States v. Carrion–Caliz*, 944 F.2d 220, 226 (5th Cir.1991) (noting the similarities between the Federal Kidnapping Act and the Hostage Taking Act and finding it "enough that he frightened or deceived them sufficiently *to cause them to remain* in his house") (emphasis added); *United States v. Eagle Thunder*, 893 F.2d 950, 953 (8th Cir.1990) (noting the detention of the victim after she was initially enticed into the perpetrator's vehicle); *United States v. Garcia*, 854 F.2d 340 (9th Cir.1988) (finding mental restraint sufficient to constitute holding where victim was threatened with physical abuse and experts testified that victim was psychologically abused); *United States v. Wesson*, 779 F.2d 1443 (9th Cir.1986) (finding that a rape victim was detained while traveling with a long-haul truck driver, even though she was not always in the truck, because she was afraid of what the rapist would do if she tried to escape and failed); *United States v. Redmond*, 803 F.2d 438, 439 (9th Cir.1986) (finding that the perpetrator confined the victim by force after inveigling her); *United States v. Chancey*, 715 F.2d 543 (11th Cir.1983) (reversing a kidnapping conviction where there was no evidence that victim was held against her will beyond the initial seizure

from her bed by a man she did not know); *United States v. Macklin*, 671 F.2d 60, 66 (2d Cir.1982) (explaining that "even if there was sufficient evidence of inveiglement, there is no evidence whatsoever that either of the children was 'held' "); *United States v. Hoog*, 504 F.2d 45, 50–51 (8th Cir.1974) (holding that victims were inveigled when they were lured by false pretenses into accepting a ride and that, once in the vehicle, they were deceived into staying in the vehicle); *United States v. Atkinson*, 916 F.Supp. 959 (D.S.D. 1996) (upholding a conviction for kidnapping for an accompanied inveiglement where the perpetrator inveigled the victim into his car under false pretenses and then held him there by lying to him about the where they were going and the purpose of the trip).

The Fourth Circuit has held that an allegation that a defendant transported the victim across state lines is an adequate allegation of holding in an indictment. *See United States v. Lewis*, 662 F.2d 1087, 1088–89 (4th Cir.1981); *Hall v. United States*, 410 F.2d 653, 659 (4th Cir.1969); *United States v. Martell*, 335 F.2d 764, 765–66 (4th Cir.1964). The government cites *Lewis* to support its argument that unaccompanied inveiglement satisfies the holding prong of kidnapping. However, this case is inapposite to the issue at bar. First, *Lewis* deals with accompanied inveiglement. In the instant case, the inveiglement was unaccompanied. Second, *Lewis* deals with the sufficiency of an indictment, not the evidence required for conviction under the statute. In the instant case, the Court is concerned not with whether the indictment adequately charged all the elements of the Federal Kidnapping Act, but whether one of those elements, holding, was satisfied. Even if we interpret *Lewis* to mean that accompanied transportation of the victim is sufficient to prove holding, *Lewis* does not answer the question of whether unaccompanied transportation is sufficient evidence of holding.

nonetheless because they all involved inveiglement followed by additional holding. *See supra,* note 18. Typically, the additional holding was accomplished through deception. *See Chatwin,* 326 U.S. at 460, 66 S.Ct. 233. The Fourth Circuit case that most clearly demonstrates inveiglement followed by separate and additional holding by deception is *United States v. Hughes,* 716 F.2d 234 (4th Cir.1983).

In *Hughes,* the perpetrator inveigled a young girl into getting into his car by saying he would take her to see her friend. *See id.* at 237. He then drove her across the state line, left the highway and pulled onto a side road. *See id.* When the girl asked why they had left a main road, the perpetrator lied to the girl and said they were going to meet a friend of the perpetrator. *See id.* The perpetrator subsequently savagely beat the girl. *See id.* The *Hughes* Court held that

> "[b]y inducing his victim by misrepresentation to enter his vehicle and to accompany him, and knowing that the victim's belief as to their purpose and destination is different from his actual illicit purpose, the kidnapper has interfered with, and exercised control over, her actions. We find this conduct sufficient to satisfy the 'involuntariness of seizure and detention' requirement of *Chatwin.*" *See id.* at 239.

In the instant case, the government relies heavily on *Hughes* as support for its proposition that inveiglement can also satisfy the holding requirement of the Federal Kidnapping Act. The government argues that, in *Hughes,* the initial deception that prompted the girl to enter the car constituted both the inveiglement and the holding. Therefore, the government argues, the initial deception that prompted Ms.

Lentz to get into her car to pick up Julia also constitutes both inveiglement and holding.

Although we agree with the government's general assertion that, under *Chatwin* as applied in *Hughes,* holding can be accomplished through deception, we think the government's reading of *Hughes* is fundamentally flawed. Neither *Chatwin,* as previously discussed, nor *Hughes* supports the government's argument that the deception inherent in inveiglement is sufficient to satisfy not only the first element of the Federal Kidnapping Act, but the second holding element as well.

While the *Hughes* Court did not delineate what facts satisfied the "holding" element in that case, the initial deception by the perpetrator that prompted the girl to get into the car constituted inveiglement, which satisfied the first element of the Federal Kidnapping Act. The perpetrator's *additional* deception after the victim questioned where they were going—not the deception constituting the inveiglement satisfied the second element of the Federal Kidnapping Act, the holding requirement. Moreover, not only did the facts of *Hughes* demonstrate holding through deception separate from and in addition to the inveiglement, the case *Hughes* cites as its main support, *Hoog,* does as well. 504 F.2d at 50–51 (saying that girls were lured by false representations into accepting a ride *and* then lured or enticed *again* by false promises to stay in the car).

In the instant case, unlike in *Hughes* and *Hoog,* there is no evidence of holding by deception in addition to the initial inveiglement. Therefore, the government's reliance on *Hughes* is misplaced.[20] Given a plain text interpretation of the Federal Kidnapping Act and the

---

**20.** In fact, *Hughes* and *Hoog* highlight the problem the government's theory faces: neither force nor deception can be employed to satisfy the holding requirement of the Federal Kidnapping Act when the inveiglement is un-

accompanied. Rather, the holding must be proved once the victim and the perpetrator meet.

In this case, there would have to be proof of holding separate and apart from the inveigle-

weight of Supreme Court and lower federal court precedent, there is but one conclusion at which we can arrive under the law: we hold that unaccompanied inveiglement by itself cannot satisfy the holding requirement of the Federal Kidnapping Act.

## V. Holding as Incidental to the Death/Murder

The government next argues that the holding incidental to Ms. Lentz's alleged murder is enough to satisfy the holding element of the Federal Kidnapping Act. It asserts that the language "holds for ransom or reward or otherwise" in the Federal Kidnapping Act is to be interpreted broadly. *See Chatwin,* 326 U.S. at 463, 66 S.Ct. 233 ("Comprehensive language was used to cover every possible variety of kidnapping followed by interstate transportation."). Moreover, the government argues that "[m]urder is the ultimate holding and the evidence of the killing of the victim may be used to satisfy the element of holding." *Government's Memorandum in Opposition to Defendant's Motion Pur-*

*suant to Rule 29, F.R.C.P.* While we agree that the Federal Kidnapping Act is to be construed broadly and that evidence of holding related to a murder may in some cases satisfy the holding requirement of the Federal Kidnapping Act, neither argument wins this case for the government.

### A. The Death in this Case does not Satisfy the Holding Requirement of the Federal Kidnapping Act

In some circumstances, evidence of holding related to a murder can establish holding for the purposes of the Federal Kidnapping Act; in others it cannot. Therefore, we must determine in which category the case at bar falls.

Many if not most courts have held that kidnapping statutes do not apply to unlawful confinements or movements *incidental* to the commission of other felonies, such as murder; only when the holding employed is greater than that necessary to accomplish the underlying felony is additional prosecution for kidnapping warranted.[21] Many state courts, including Virgi-

---

ment once Ms. Lentz arrived at Jay Lentz's home. We must emphasize that there is no evidence that Ms. Lentz ever arrived at Jay Lentz's home. An evidentiary inference *may* be derived from Ms. Lentz's statements of her intent to go to Jay Lentz's home that Ms. Lentz did, in fact, go to Jay Lentz's home. *See United States v. Lentz,* Crim. No. 01–150–A, 2002 WL 32141841, Memorandum Order, May 14, 2002, at page 9, —— F.Supp.2d at ——. Additionally, there is an evidentiary inference from Ms. Sauder's testimony that Jay Lentz told her that Ms. Lentz came to his house after he had told her not to. Again, these two inferences support the theory that Ms. Lentz went to Jay Lentz's home. These two inferences do not show Ms. Lentz was held or detained by Jay Lentz.

21. *See, e.g., Etsitty,* 130 F.3d at 429 (Kleinfeld, J., concurring) (asserting that "the holding must be more than an incidental part of some other crime or attempt. If the holding would be of little consequence to a victim, were it not for the crime or attempt of which it was an incidental part, or if it was not for an

appreciable period, then treating the seizure and confinement of the victim as kidnapping would exceed the scope of the statute"); *Boone,* 959 F.2d at 1556 n. 6 (explaining that the holding in that case amounted to "far more than inherent aspects of the murder and thefts"); *United States v. Fernandez,* 797 F.2d 943, 951 (11th Cir.1986) (upholding conviction of both kidnapping and murder where there was evidence that the holding served several purposes separate and apart from accomplishing the killing); *United States v. De La Motte,* 434 F.2d 289, 292–93 (2d Cir.1970) (upholding convictions for kidnapping and interstate transportation of stolen goods where detention by truck driver was not momentary in the course of a hold-up, but extensive in that the victim was held, transported and tied to a tree); *United States v. Frank,* 11 F.Supp.2d 314 (S.D.N.Y.1998)(prosecution for kidnapping resulting in death where defendant transported victim across state lines, locked her in the trunk of a car and killed her by setting fire to the car); *see also* 1 Am. Jur.2d Abduction and Kidnapping, § 9 (not-

nia, have also adopted this distinction.[22]

The clearest explanation of the difference between a holding incidental to an underlying felony, thus rendering additional prosecution for kidnapping inappropriate, and a holding more than incidental to the underlying felony, upholding a kidnapping prosecution, was given in *United States v. Peden*, 961 F.2d 517 (5th Cir. 1992). In *Peden*, the defendant invited four young girls to a skating rink, took one girl a long distance away, raped her and detained her afterwards. *See id.* at 518–519. The Court explained that the detention of the victim was beyond what was necessary to commit rape and therefore

the kidnapping conviction was appropriate. *See id.* at 522–23. It compared the facts of the case before it to a hypothetical where, instead of being driven far away and raped elsewhere, the girl was raped in the skating rink bathroom. *See id.* at 522. In the latter case, the holding would have been incidental to the rape, and a kidnapping conviction would not have been appropriate. *See id.*

Whether the holding in a particular case is incidental to an underlying felony or constitutes kidnapping is not always clear.[23] However, the instant case does present this problem. In the instant case,

ing that a kidnapping may be incidental to another crime when the confinement is of minimal duration or movement). *But see United States v. Jones*, 808 F.2d 561 (7th Cir. 1986) (upholding convictions under both the Mann Act and the Federal Kidnapping Act as each required additional elements not required by the other); *United States v. Dixon*, 592 F.2d 329 (6th Cir.1979) (upholding convictions for both air piracy and kidnapping for the same reasons); *United States v. Sarracino*, 131 F.3d 943 (10th Cir.1997) (upholding convictions for both kidnapping and murder when detention of victim was accompanied, prolonged, but addressing only "ransom or reward or otherwise" element, not holding).

**22.** *See, e.g., Berry*, 604 F.2d at 226 ("The inequity inherent in permitting kidnapping prosecutions of those who in reality committed lesser or different offenses, of which temporary seizure or detention played an incidental part, figured prominently in the decisions of numerous state courts to limit severely the scope of their state kidnapping statutes."); *Hoke v. Virginia*, 237 Va. 303, 377 S.E.2d 595 (1989) (upholding convictions of both rape and kidnapping where detention was greater in scope and duration than required for the act of rape); *Coram v. Virginia*, 3 Va.App. 623, 352 S.E.2d 532 (1987) (finding sufficient evidence of holding separate and apart from attempted rape to justify additional kidnapping conviction); *Brown v. Virginia*, 230 Va. 310, 337 S.E.2d 711, 713 (1985) (holding that the General Assembly, in enacting the abduction statute, "did not intend to make the kind

of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act punishable, as a separate offense."); *Johnson v. Virginia*, 221 Va. 872, 275 S.E.2d 592 (1981) (overturning a kidnapping conviction where the detention was only long enough to commit assault and battery); 1 Am.Jur.2d Abduction and Kidnapping § 9 (listing the states adopting this view).

**23.** The test most often used in such situations was set forth in *Berry*. 604 F.2d at 227. In *Berry*, a young man rode with some other young men to the beach, where he was subsequently robbed and assaulted. *See id.* at 228. The Court found that although there was evidence he was inveigled into accompanying the perpetrators to the beach, any holding was incidental to the robbery and assault. *See id.*

Although Berry involved the application of the Virgin Islands Kidnapping Statute, its four-tiered analysis has been used, even if not adopted, to answer questions regarding the application of the Federal Kidnapping Act. A prototypical application of the *Berry* test is seen in *Howard*. 918 F.2d at 1535. In *Howard*, the court found that there was no evidence that the defendant intended to detain the victim any longer than was necessary to rob him; that the detention that occurred would have occurred during the robbery; that there was no detention in addition to the robbery and no evidence of increased danger and that, therefore, kidnapping had not been shown. *See id.* at 1536–37.

we find no evidence of holding incident to a murder or at all.

■ The evidence that, in the light most favorable to the government, purportedly suggests holding incidental to murder is 1) the testimony of Ms. Sauder saying that Jay Lentz told her that Ms. Lentz came to his house on April 23, 1996, despite his instructions to Ms. Lentz that she should not come; 2) the spot of Jay Lentz's blood on Ms. Lentz's car seat; 3) the repainting of the carport floor at Jay Lentz's home; 4) the removal of the sofa from Jay Lentz's home; 5) the presence and then disappearance of a blue tarp in Jay Lentz's home; 6) the removal of a real estate lockbox from Jay Lentz's home; and 7) the stopping of the mail delivery at Jay Lentz's home. Each piece of evidence will be dealt with in turn.

First, an evidentiary inference exists that Ms. Lentz went to Jay Lentz's home from her statements to co-workers, friends and family. There is no direct evidence, per se, that Ms. Lentz traveled to Jay Lentz's home on the night that she disappeared. Rather, there is the testimony of Ms. Rigger, who said she spoke to Ms. Lentz on April 23, 1996, and Ms. Lentz said she was going to Jay Lentz's home to pick up Julia. Additionally, co-workers, friends, and Ms. Lentz's mother, Ms. Butt testified that Ms. Lentz told them that she was going to Jay Lentz's home to pick up Julia following her visit to see her grandparents in Indiana on April 23, 1996. Additionally, there is the critical testimony of Ms. Sauder. Ms. Sauder testified that she spoke to Jay Lentz, following Ms. Lentz's disappearance and that Jay Lentz told her that he told Ms. Lentz not to come to his house to pick up Julia because she was not there and that Ms. Lentz came to his house anyway.

■ Typically, testimony about the victim's plans such as that by Ms. Rigger, and Ms. Lentz's other friends and co-work-

ers would be considered inadmissible hearsay. However, such statements are admissible whenever the declarant's intention itself is a distinct and material fact in the chain of events of a case. *See United States v. Lentz*, Crim. No. 01–150–A, Memorandum Opinion, —— F.Supp.2d ——, ——, May 14, 2002 at p. 9, 2002 WL 32141841 (detailed memorandum opinion on evidentiary issues in this case) (citations omitted); *see also Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (holding as admissible statements that a declarant intended to travel to meet a particular person when the declarant was never heard from again). Such a statement of intent is admissible under the state of mind exception to the hearsay rule to promote an inference of the declarant's future conduct. *See United States v. Jenkins*, 579 F.2d 840, 842–43 (4th Cir.1978). Therefore, there exists an evidentiary inference that Ms. Lentz traveled to Jay Lentz's home. This evidentiary inference does not create a jury issue that Ms. Lentz was detained or held at Jay Lentz's home, that she was held in the carport or that she was murdered by Jay Lentz.

Second, the government argues that the blood purportedly belonging to Jay Lentz found on the seat of Ms. Lentz's car is indicative of a struggle between Jay Lentz and Ms. Lentz during the alleged murder. During the trial, however, the government argued that Ms. Lentz's car was not the crime scene, but rather that the car was used to dispose of Ms. Lentz's body and to create the appearance that she was assaulted and killed in a bad neighborhood in the District of Columbia. Regardless of which unsupported theory the Court accepts, the blood evidence does not address the element of holding or whether Ms. Lentz was held or even detained against her will incidental to the alleged murder.

Third, it is difficult to draw any inference from the allegation that a sofa was removed from Jay Lentz's home at some point after Ms. Lentz's disappearance. There is no evidence that Ms. Lentz's blood was found on the sofa or anywhere in Jay Lentz's home.

Fourth, the significance of the disappearance of the blue tarp is purely conjectural. Although the government asserts Ms. Lentz's body was wrapped in the tarp, there is no evidence to support such an inference. No one really knows what to make of the blue tarp, as there are no witnesses that Ms. Lentz was murdered in the home, much less that her body was wrapped in a tarp. While the Court is required to draw inferences in favor of the government at this stage in the case, the law is that the Court must draw *reasonable* inferences from evidence. There simply is no evidence regarding the blue tarp except Ms. Ives' testimony that she saw one inside Jay Lentz's home.

Fifth, the testimony about Jay Lentz painting or washing his carport is suspicious; however, the acts themselves do not create a jury issue on the issue of holding or murder. The government argues that Ms. Lentz was either killed in the carport or that her bloody body was dragged through it, staining the floor. No scientific evidence or witness testimony that Ms. Lentz's blood was on the carport floor was adduced to support either theory.

Sixth and seventh, evidence that Jay Lentz directed his realtor, Ms. Ives to remove the real estate lockbox from his home days before Ms. Lentz disappeared is suspicious. The same can be said for Jay Lentz's direction to his mailman to stop his mail. These events certainly bear on Jay Lentz's intent. However, these facts do not create any jury issue as to holding connected to an alleged murder.

The foregoing facts viewed in a light most favorable to the government do not show a jury issue on the element of holding required to prove kidnapping under the Federal Kidnapping Act. These facts show neither, if, when, where or how Ms. Lentz, was held against her will [24] nor if, when, where or how Ms. Lentz was murdered by Jay Lentz. Of course, the government did not have to prove murder—this case is a kidnapping case, not a murder case, though the government has presented this case as a murder case, despite the fact that it was not.

The Court has carefully considered the government's argument that murder is the ultimate holding in federal kidnapping; however in order to establish murder (and holding connected to it), the government would have had to prove the facts surrounding the death of Ms. Lentz. On the facts at bar, there is no evidence to weigh to determine whether Ms. Lentz was murdered and, if so, what the extent of the holding that occurred when she was murdered.[25] Even if we are to assume *arguendo* that Jay Lentz murdered Ms. Lentz, there is insufficient evidence to determine whether any holding was incident

---

**24.** These issues are critical. The government's theory was that Jay Lentz lured his wife to his home to murder her in order to avoid future financial obligations to pay support and marital share of property in their divorce. Under the government's theory, when Ms. Lentz entered the door, Mr. Lentz murdered her and then began to follow his plan to dispose of the body. The government did not argue that Jay Lentz lured Ms. Lentz to his home to detain her, bind her up with rope and tape to prevent her from appearing in court to defend her divorce and that as a result of suffocation, Ms. Lentz died in his custody. The former argument may be a strong argument in a murder case, not a kidnapping case. The latter argument and facts would clearly show a kidnapping.

**25.** Therefore, this court need not decide whether to adopt *Berry*.

to that murder or in excess of that required for murder, thus supporting a kidnapping conviction. Like *Howard,* there is no evidence in the record that Jay Lentz held Ms. Lentz, if at all, beyond the minimum amount of time required to kill her. In fact, the murder, according to the government, was the goal of the inveiglement, and there is no reason to suggest a detention beyond that which was inherent in the murder would have been necessary or desired. Therefore, the government simply did not provide evidence supporting a finding that Ms. Lentz was held in connection to her alleged murder.

### B. Evidence of Holding Separate from the Murder or the Inveiglement

Simply put, there is no evidence of holding separate from Ms. Lentz's inveiglement or death from which a rational fact finder could infer holding as required by the Federal Kidnapping Act.[26] The government did not argue that any such evidence exists, nor do we find any.

As we have already held that inveiglement cannot satisfy the holding element of the Federal Kidnapping Act, and we now

find that no evidence of holding separate from or incidental to Ms. Lentz's death was adduced by the government sufficient to allow any rational trier of fact to find the essential element of holding to support a federal kidnapping resulting in death conviction, Jay Lentz's Rule 29 Motion for Judgment of Acquittal must be granted.

### VI. Conclusion

 Much will be said about how this ruling prevented the federal government from bringing to justice an alleged murderer.[27] It is worth saying again that this was a federal kidnapping case, not a federal murder trial. *See Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 5 L.Ed. 257 (1821) (explaining that Congress has no general authority to punish murder committed within any one state). As the Honorable Chief Justice of the United States Supreme Court explained, "[f]ederal courts were not created to adjudicate local crimes, no matter how sensational or heinous the crimes may be. State courts do, can, and should handle such problems." [28]

*United States v. Lentz* was a federal kidnapping case, despite the government's

---

**26.** To be clear, we do not say here that the detention used in committing a particular murder can never satisfy that which is necessary for kidnapping.

**27.** The government argued in *Wills* that the crime would go unprosecuted unless the federal kidnapping charge was allowed to proceed. *Compare Brief for the United States of America,* at 29 (saying a murder could not be prosecuted "for technical reasons relating to venue") *with Brief for Appellee Christopher Andaryl Wills,* at 14 (saying those reasons are a "mystery" and outlining the proper venue for a murder charge).

**28.** William H. Rehnquist, *The 1998 Year–End Report of the Federal Judiciary,* Third Branch, Jan. 1999 (arguing that "[t]he trend to federalize crimes that traditionally have been handled in state courts not only is taxing the Judiciary's resources and affecting its budget needs, but it also threatens to change entirely the nature of our federal system." [hereinafter *Rehnquist report* ]); see also Task Force on Federalization of Crim. Law, American Bar

Ass'n, *The Federalization of Criminal Law,* at 10 (1998) (noting the exponential growth of federal crimes); Michael A. Simons, *Prosecutorial Discretion and Prosecution Guidelines: A Case Study in Controlling Federalization,* 75 N.Y.U. L.Rev. 893, 931 (2000) (noting the widespread concern over the federalization of crime and that "much of the pressure that prosecutors face to federalize crime comes from individual cases in the field"); *see also United States v. Hickman,* 179 F.3d 230, 242–43 (5th Cir.1999) (per curiam dissent) ("That the federal courts were created as courts of limited jurisdiction is no historical happenstance, some quirk of Article III without reflection elsewhere in the Constitution. Rather, their limited jurisdiction, set against the general jurisdiction of state courts, is integral to our federalism .... Federal courts cannot play their vital historical role if they are to be cast as major criminal courts, trying the robberies, murders, assaults, and extortion historically the province of the states.").

statements to the contrary. Unlike the classic tragic kidnapping case of the Lindbergh baby, where a child was taken away under the cover of darkness by strangers, transported across state lines, and held for ransom, which finally ended with the infant's death, this case suggests a mysterious intrastate disappearance of Ms. Lentz under suspicious circumstances.

The government acknowledged in a prior hearing early on in this case that this was a novel prosecution based upon an unprecedented ruling by the Fourth Circuit in *Wills*.[29] Now that the Court has reviewed the applicable law, heard all the evidence, and had an opportunity to consider the testimony of the witnesses and to view scientific evidence, the Court concludes that while there may be evidence of something here, it is not federal kidnapping as defined in the United States Code.

Holding a victim against her will is the essence of the crime of kidnapping. The government bears the burden of proving that and all elements of the crime. *United States v. Hamblin,* 911 F.2d 551, 558 (11th Cir.1990). As set forth above, it is evident that the holding element of kidnapping was not proved in this case. Rather, Jay Lentz was improperly convicted of kidnapping resulting in death.[30] To allow this conviction of kidnapping resulting in death to stand would be to allow the federal government to, in essence, secure a conviction for first degree murder without having to support the grade of that offense with evidence.[31] Do-

---

**29.** *See* Assistant United States Attorney Patricia Haynes, Transcript of Motions, *United States v. Lentz,* Crim. No. 01–150–A at 46–47 (E.D. Va. June 22, 2001) ("Your Honor, the police have been investigating this case since 1996, but I can tell the Court that what happened was once all the leads were followed up and did not produce anything additional, that this case did not proceed until the Wills case changed the law and made some advances in the law in this circuit. And once the Wills case broke new grounds, then this case was—began to be looked at federally."); Assistant United States Attorney Steve Mellin, *id.,* at 106 ("They couldn't charge a homicide in Prince George's County. They couldn't charge anything in Arlington. All you have in Arlington is someone being told to come over and get the child. That's no charge. It's only when the Wills case comes along in December of 2000 that it's clear that there is no need to have accompaniment. And it's clear that the government can proceed with this theory. There is no other place for the government to have brought this charge.")

**30.** In the state of Maryland, where the government argues Ms. Lentz was killed, first degree murder is the deliberate, premeditated, and willful killing committed by lying in wait; poison; or in the perpetration of or an attempt to perpetrate one of several enumerated felonies. *See* Md.Code Ann. § 2–201. It is punishable by life imprisonment with or without the possibility of parole or death. *See id.* Any murder that is not in the first degree, is murder in the second degree. *See* Md.Code Ann. § 2–204. The burden is on the prosecution to elevate any offense to murder in the first degree. *See DeVaughn v. Maryland,* 232 Md. 447, 194 A.2d 109 (1963). Maryland retains the common-law definition of manslaughter. *See Rolfes v. Maryland,* 10 Md. App. 204, 268 A.2d 795, 796 (1970) (defining manslaughter as "unlawful and felonious killing of another, without malice aforethought, either expressed or implied").

**31.** Factually analogous situations in Maryland have lead to convictions on crimes as serious as first degree murder and as reduced as manslaughter.

In *Snyder v. Maryland,* the state argued that the defendant killed his wife because their marriage was failing, that defendant wanted to keep their marital house and collect the wife's insurance policy. 361 Md. 580, 762 A.2d 125, 129 (2000). The wife's body was found not far from the marital home. *See id.* The defendant was twice convicted of first degree murder, and Maryland twice reversed for error. *See id.* The convictions were based solely on circumstantial evidence, including the defendant's behavior before and after the death of his wife, their prior relationship, the fact that the wife's body was found

ing so clearly runs afoul of the Eighth and Fifth Amendments of the Constitution.

Despite the considerable weight the Court must afford to a jury verdict in a criminal case, and rarely if ever should a verdict of guilt be set aside, this Court harbored reservations about the legal issues presented herein at the close of the government's case. Following established, legal principles enumerated herein, the Court has set forth herein a complete recitation of the law and the reasons for this ruling. This Court is unwilling to contort the law of federal kidnapping to fit the facts of this case; a case that transgresses the outer limits of federal kidnapping law.

Accordingly, for the reasons stated above, the Court holds that the government failed to produce evidence of holding sufficient to satisfy the Federal Kidnapping Act and it is hereby

**ORDERED** that Defendant's Rule 29 Motion is **GRANTED** and this case is **DISMISSED**; and it is further

**ORDERED** that this Order be **STAYED** for seven days until July 29, 2003, to allow for a pre-trial services investigation and consideration of bond pending appeal; and it is further

**ORDERED** that pre-trial services commence an investigation into whether there is a combination of conditions that will: 1) ensure Jay Lentz's appearance before the Court for further proceedings and 2) ensure safety of the community pursuant to 18 U.S.C. § 3142, 3143, *et seq.* and it is further

**ORDERED** that pre-trial services present its report to the Court not later than Monday, July 28, 2003; the parties are further

**ADVISED** that the Court will hold a hearing to determine whether to release Jay Lentz on bond on Tuesday, July 29, 2003, at 10:00 a.m.

The Clerk is directed to forward a copy of this Order to counsel of record.

and no robbery or sexual assault had occurred, and the defendant's pecuniary gain from his wife's death.

In *Hurley v. Maryland,* the defendant was charged with first degree murder, second degree murder and manslaughter in the presumed death of his wife, whose body was never found. 60 Md.App. 539, 483 A.2d 1298 (1984). At the time of the death, the defendant and his wife were separated. *See id.* at 1300. On the day of the wife's disappearance, she and their daughter, Katie, drove to the defendant's home for an unknown reason. *See id.* at 1301. Defendant met wife outside and then the two went inside, again for unknown reasons. *See id.* A short while later, Katie, who had been waiting in the car, heard a scream she believed to be her mother's, peeked through a window, and saw her mother on the floor and the feet and shoes of a man. *See id.* Katie went back to the car.

*See id.* The defendant came out a short while later and told Katie that her mother was using the phone and that Katie and the defendant were going to the beach. *See id.* The wife's body was never found. *See id.* at 1300. The Defendant was convicted of manslaughter based on his strange behavior after his wife's disappearance, testimony that his financial situation was desperate and the testimony of his daughter, Katie.

In both *Snyder* and *Hurley,* it is apparent that the Maryland statutory requirements for the crimes had to be proven. In the instant case, the government simply had to prove kidnapping and death, not murder. To allow the instant conviction to stand, when the elements of kidnapping were not all proven, would basically equal a conviction of Jay Lentz solely for the death of Ms. Lentz without having to prove any the elements of, for example, murder or manslaughter.